# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  10-32769

LINGHAM RAWLINGS, LLC

        Debtor

        LINGHAM RAWLINGS, LLC

            Plaintiff

      v.

Adv. Proc. No.  10-3125

SALVADOR A. GAUDIANO,
individually and d/b/a
BRIARCLIFF MANAGEMENT COMPANY

           Defendant


## M E M O R A N D U M


**APPEARANCES:**   GRIBBLE CARPENTER & ASSOCIATES, PLLC
                Keith L. Edmiston, Esq.
                118 Parliament Drive
                Maryville, Tennessee  37804
                Attorneys for Plaintiff

                JONES, MEADOWS & WALL, PLLC
                J. Thomas Jones, Esq.
                Post Office Box 377
                Knoxville, Tennessee  37901-0377
                Attorneys for Defendant


**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the Plaintiff on November 11, 2010, seeking a monetary judgment against the Defendant for breach of contract, fraudulent concealment, conversion, breach of fiduciary duties, professional negligence, and tortious interference with business relationships; seeking to avoid and recover fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) (2006) and 11 U.S.C. § 550(a)(1) (2006), respectively; seeking to avoid fraudulent transfers under 11 U.S.C. § 544(b)(1) (2006) through Tennessee Code Annotated §§ 66-3-305 and 66-3-306(a) (2004) and to recover the avoided transfers under 11 U.S.C. § 550(a)(1) (2006); seeking to avoid and recover preferential transfers under 11 U.S.C. § 547 (2006) and 11 U.S.C. § 550(a)(1) (2006); seeking an accounting; for equitable subordination under 11 U.S.C. § 510(c) (2006) and/or 105(a) (2006); and seeking disallowance of claims under 11 U.S.C. § 502(d) (2006). The Defendant's Answer was filed by the Defendant on January 21, 2011, in which he denied the Plaintiff's allegations and entitlement to the relief sought.[1]

The trial was held on July 31 and August 1, 2012. The record before the court consists of Stipulations filed by the parties on July 20, 2012, one stipulated exhibit, thirty-five exhibits entered into evidence, and the testimony of four witnesses, Eric Williams, David Michael Costello, the Plaintiff through its sole member, Sharon L. Power, and the Defendant. Following the trial, the court directed the parties to file proposed findings of fact and conclusions of law, which were filed on November 16, 2012.

---

[1] On July 19, 2012, the Defendant filed the Defendant's Motion to Amend Answer (Motion to Amend), seeking to add as affirmative defenses the statutes of limitations for breach of contract, conversion, breach of fiduciary duty, and professional negligence found within Tennessee Code Annotated §§ 28-3-109 and 28-3-105. The Plaintiff filed the Plaintiff's Response to Defendant's Motion to Amend Answer on July 25, 2012, in opposition of the Motion to Amend. After a hearing on July 26, 2012, the court denied the Motion to Amend on the grounds of undue delay and prejudice to the Plaintiff.

This adversary proceeding is, in part, a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), and (O) (2006), and, in part, a non-core proceeding under 28 U.S.C. § 157(c)(1) (2006) that is related to the underlying bankruptcy case. The parties have expressly consented to entry of final orders, including a final judgment, by the bankruptcy court as to all issues raised. SCHED. ORDER at ¶ 1.

## I

In December 2000, the Plaintiff, a Tennessee limited liability company, was formed for the purpose of purchasing and operating a commercial building by Sharon L. Power, a realtor for approximately thirty-two years who is its sole owner/member and chief manager. Prior to this date, on October 10, 2000, Ms. Power entered into a Real Estate Sales Contract (Sales Contract) for the purchase of a shopping center located at 7212 Kingston Pike, Knoxville, Tennessee (Shopping Center) from the Defendant, who owned a 100% interest in the Shopping Center at the time, for the contemplated purchase price of $2,750,000.00. TRIAL EX. 22. Under the terms of the Sales Contract, the sale was subject to the following conditions:

1. Buyer obtaining mortgage of approximately $2,000,000.00 at market rate.

2. Seller guaranteeing Metz & Kirschner rent through the end of their lease.

3. Seller guaranteeing Diversified Insurance rent for a period of one year from closing.

4. Briarcliff Management entering into a management agreement for a period of two (2) years for a fee of 2%.

TRIAL EX. 22 at ¶ 15. The Defendant, who was a certified public accountant in Pennsylvania and New Jersey prior to 1986, owns and operates the sole proprietorship known as Briarcliff

Management, through which he managed the Shopping Center. He is also an officer in a corporation called Miners and owns a 16 2/3% interest in Diversified Energy, Inc. and a 25% interest in Diversified Holdings, Inc., which together comprise the partnership known as Station West.[2]

As evidenced by the Settlement Statement, the sale of the Shopping Center to Ms. Power closed on February 28, 2001. TRIAL EX. 30. The Plaintiff, in whom title to the Shopping Center was vested, financed approximately $2,000,000.00 of the $2,806,031.03 final purchase price through a loan with Bridger Commercial Funding under the terms of an Amended and Restated Promissory Note Secured by Deed of Trust (Promissory Note) dated February 26, 2001, with the loan secured by a Deed of Trust and Absolute Assignment of Rents and Leases and Security Agreement (and Fixture Filing) executed on February 28, 2001. TRIAL EX. 18; TRIAL EX. 19. The Plaintiff's required monthly principal and interest payments to Bridger Commercial Funding under the Promissory Note were $15,370.14. TRIAL EX. 18 at ¶ 4.3. Additionally, pursuant to Exhibit A to Promissory Note Additional Terms and Conditions attached to the Promissory Note, the Plaintiff was also required to make the following payments to Bridger Commercial Funding:

3.  Impounds.

3.1 Amounts. Borrower shall deposit with Lender the amounts ("Impounds") stated below on the dates stated below, for the purpose of paying the costs stated below:

(a) Taxes. (i) $21,400.14 on the Closing Date, and (ii) on the first Payment Date on which both principal and interest under the Loan are payable and on each Payment Date thereafter, an amount estimated from time to time by Lender

---

[2] For the purposes of this Memorandum, all references to the Defendant, individually and doing business as any or all of the entities in which he holds an ownership interest will be collectively referred to as "Defendant." References to the transfers that the Defendant made to himself and/or one of these entities is likewise referred to as being made by the Defendant to himself.

in its sole discretion to be sufficient to pay for taxes and other liabilities payable by Borrower under Section 6.8 of the Deed of Trust.  The initial estimated amount to be deposited by Borrower on each Payment Date is $3,566.69.

(b) <u>Insurance</u>.  (i) $1,905.00 on the Closing Date, and (ii) on the first Payment Date on which both principal and interest under the Loan are payable and on each Payment Date thereafter, an amount estimated from time to time by Lender in its sole discretion to be sufficient to pay for insurance payable by Borrower under Section 6.9 of the Deed of Trust.  The initial estimated amount to be deposited by Borrower on each Payment Date is $635.33.

. . . .

(d) <u>Tenant Improvements</u>. $4,108.00 on the first Payment Date on which both principal and interest under the Loan are payable and on each Payment Date thereafter until the third anniversary of the date hereof and until the sum of $150,000.00 is on deposit for the payment of tenant improvements, brokerage commissions and other leasing costs that may be required for new tenants in the Property; provided, however, that if sums are drawn from this Impound for the payment of any said tenant improvements, brokerage commissions and other leasing costs resulting in the balance on deposit being reduced to an amount less than $150,000.00, then Borrower shall make monthly payments in the amount set forth above commencing on the next Payment Date and continuing on each Payment Date thereafter until the balance on deposit is restored to $150,000.00.  Amounts on deposit for this Impound shall bear interest at Lender's standard interest rate for passbook savings deposit accounts in effect from time to time for balances equivalent to the balance of this Impound.

. . . .

(g) <u>Capital Improvements</u>. $467.00 on the first Payment Date and on each Payment Date thereafter for Capital Improvements . . .[.]

. . . .

7.  <u>Deposits to the Debt Service Reserve</u>.  Borrower shall deposit with Lender the reserve amounts stated below on the dates stated below for the purpose of paying the costs stated below:

(a) <u>Debt Service</u>. $1,500.00 ("Debt Service Deposit") on the first Payment Date on which both principal and interest under the Loan are payable and on each Payment Date thereafter until the date which is thirty (30) months (i.e., August 26, 2003) from the date hereof and until the sum of $46,500.00 is on deposit for the

5

Lender to apply to the repayment of the principal balance of this Note in order to satisfy the debt service coverage ratio requirement . . . of not less than 1.30 to 1.00; provided, however, that from and after the date that the sum of $46,500.00 is on deposit with Lender as the Debt Service Reserve . . ., if sums are drawn from said Debt Service Reserve for the repayment of the principal balance of this Note in order to satisfy the debt service coverage ratio requirement resulting in the balance of the Debt Service Reserve being reduced to an amount less than $46,500.00, then Borrower shall make a monthly Debt Service Deposit commencing on the next Payment Date and continuing on each Payment Date thereafter until the balance on deposit is restored to $46,500.00.

> . . . .

TRIAL EX. 18 at Ex. A ¶¶ 3, 7.  Including the impounds and additional payments required under the Promissory Note, the Plaintiff's total monthly obligation to Bridger Commercial Funding was $25,647.16.

As an additional condition of financing, Bridger Commercial Funding required that the Plaintiff engage arm's length management for the Shopping Center.  Accordingly, on February 28, 2001, the Plaintiff entered into a Management Agreement with the Defendant, through his sole proprietorship Briarcliff Management, to manage the Shopping Center.  TRIAL EX. 5.  Under the terms of the Management Agreement, the Defendant was appointed as "sole and exclusive Agent of Owner to lease and manage the property [located at 7212 Kingston Pike, Knoxville, Tennessee 37919]" for a term of two years, to be automatically renewed annually unless terminated.  TRIAL EX. 5 at ¶¶ 1.1 - 1.3.  The Management Agreement imposed upon the Defendant a number of duties and responsibilities, including but not limited to establishment of a separate operating account for the deposit of rents and security deposits, enforcement of leases, remitting payments for operating expenses, providing financial reports, advertising the property, maintenance and repair of the property, and contracting for utilities as follows:

6

*2.1 OPERATING (AND OR) RESERVE ACCOUNT(S)*

Agent shall establish a separate account(s) known as the 7212 Kingston Pike Operating (and/or) Reserve Account(s), separate and apart from Agent's corporate accounts, for the deposit of receipts collected as described herein, in a bank or other institution whose deposits are insured by the federal government.  Such depository shall be selected by the Agent. . . . .  Funds in the Operating (and/or) Reserve Account(s) remain the property of Owner subject to disbursement of expenses by Agent as described in this Agreement.

. . . .

*3.1 AGENT'S AUTHORITY*

Agent shall collect (and give receipts for, if necessary) all rents, charges and other amounts receivable on Owner's account in connection with the management and operation of the Premises.  Such receipts (except tenants' security deposits and advance rentals . . .) shall be deposited in the Operating (and/or) Reserve Account(s) maintained by Agent for the Premises.

*3.2 SECURITY DEPOSITS*

Agent shall collect, deposit, and disburse tenants' security deposits in accordance with the terms of each tenant's lease. . . . .  Agent shall comply with all applicable state or local laws concerning the responsibility for security deposits and interest, if any.

*4.1 OPERATING EXPENSES*

From the Operating (and/or) Reserve Account(s), Agent is hereby authorized to pay or reimburse itself for all expenses and costs of operating the Premises and for all other sums due Agent under this Agreement, including Agent's compensation under section 16.

*4.2 DEBT SERVICE*

Owner shall give Agent advance written notice of at least 30 days if Owner desires Agent to make any additional monthly or recurring payments (such as mortgage indebtedness, general taxes, or special assessments, or fire, steam boiler, or other insurance premiums) out of the proceeds from the Premises. . . . .

. . . .

7

Section 6 FINANCIAL AND OTHER REPORTS

By the 15th day of each month, Agent shall furnish Owner with a statement of cash receipts and disbursements from the operation of the Premises during the previous month.  In addition, Agent shall, on a mutually acceptable schedule, prepare and submit to Owner such other reports as the Profit & Loss Statement, and the Balance Sheet.

Section 7 ADVERTISING

Agent is authorized to advertise the Premises or portions thereof for rent, using periodicals, signs, plans, brochures, or displays, or such other means as Agent may deem proper and advisable.  . . . .  The cost of such advertising shall be paid out of the Operating and/or Reserve Accounts.  All advertising shall make clear that Agent is the manager and NOT the Owner of the Premises.

*8.1 ENFORCEMENT OF LEASES*

Agent is authorized to institute, in Owner's name, all legal actions or proceedings for the enforcement of any lease term, for the collection of rent or other income from the Premises, or for the evicting or dispossessing of tenants or other persons from the Premises.  Agent is authorized to sign and serve such notices as Agent deems necessary for lease enforcement, including the collection of rent or other income. Agent is authorized, when expedient, to settle, compromise, and release such legal actions or suits or reinstate such tenancies.  Attorney's fees, filing fees, court costs, and other necessary expenses incurred in connection with such actions and not recovered from tenants shall be paid out of the Operating (and/or) Reserve Account(s) or reimbursed directly to Agent by Owner.  Agent may select the attorney of its choice to handle such litigation.  Agent is authorized to hire outside real estate agency to expedite leases.

Section 9 MAINTENANCE AND REPAIR

Agent is authorized to make or cause to be made, through contracted services or otherwise, all ordinary repairs and replacements reasonably necessary to preserve the Premises in its present condition and for the operating efficiency of the Premises, and all alterations required to comply with lease requirements, governmental regulations, or insurance requirements.  Agent is also authorized to decorate the Premises and to purchase or rent, on Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms, and other items necessary for the management, maintenance, or operation of the Premises.  Such maintenance and decorating expenses shall be paid out of the Operating (and/or) Reserve Account(s).  This section applies except where decorating and/or maintenance are at tenants' expense as stipulated in a lease.

*9.1 APPROVAL FOR EXCEPTIONAL MAINTENANCE EXPENSE*

The expense to be incurred for any one item of maintenance, alteration, refurbishing, or repair shall not exceed the sum of $500.00, unless such expense is specifically authorized by Owner, or is incurred under such circumstances as Agent shall reasonably deem to be an emergency. . . . .

Section 10 CONTRACTS, UTILITIES AND SERVICES

Agent is authorized to negotiate contracts for nonrecurring items of expense, not to exceed $5,000.00 unless approved by Owner, and to enter into agreements in Owner's name for all necessary repairs, maintenance, minor alterations, and utility services. Agent shall, in Owner's name and at Owner's expense, make contracts on Owner's behalf for electricity, gas, telephone, fuel, or water, and such other services as Agent shall deem necessary or prudent for the operation of the Premises. All utility deposits shall be the Owner's responsibility, except that Agent may pay same from the Operating (and/or) Reserve Account(s) at Owner's request.

TRIAL EX. 5 at ¶¶ 2.1-4.2, 6-10. The Management Agreement specifically provided that "[i]n no event shall Agent be required to use its own funds to pay such disbursements [due and payable for operating expenses and/or debt service,] . . . [n]or shall Agent be required to advance any monies to Owner[.]" TRIAL EX. 5 at ¶ 5.

The Defendant's compensation under the Management Agreement was "2% of the total monthly gross receipts from the Premises, payable by the 5th day of the month . . . [with the percentage] based upon the total gross receipts from the Premises during the preceding month." TRIAL EX. 5 at ¶ 16. The Management Agreement could be terminated by either party, "with or without cause, at the end of the initial term or of any following term year upon the giving of 60 days' written notice prior to the end of said initial term or following term year." TRIAL EX. 5 at ¶ 20.1. Additionally, termination for cause was authorized in the event of: (a) breach; (b) failure to act;

(c) excessive damage; and/or (d) inadequate insurance. TRIAL EX. 5 at ¶ 20.2.  The Management

Agreement expressly defined the parties' relationship as follows:

> Section 11 RELATIONSHIP OF AGENT TO OWNER
>
> The relationship of the parties to this Agreement shall be that of Principal and Agent, and all duties to be performed by Agent under this Agreement shall be for and on behalf of Owner, in Owner's name, and for Owner's account.  In taking any action under this Agreement, Agent shall be acting only as Agent for Owner, and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement except that of Principal and Agent, or as requiring Agent to bear any portion of losses arising out of or connected with the ownership or operation of the Premises.  Nor shall Agent at any time during the period of this Agreement be considered a direct employee of Owner.  Neither party shall have the power to bind or obligate the other except Agent is authorized to act with such additional authority and power as may be necessary to carry out the spirit and intent of this Agreement.

TRIAL EX. 5 at ¶ 11.

From February 28, 2001 through early June 2010, the parties operated under the Management

Agreement.  During that time period, with the exception of searching for tenants and negotiating

leases, a service which was handled by Joe Chalmers, a licensed real estate agent, at the parties'

agreement and consent, the Defendant was given absolute authority and Ms. Power took no actions

on behalf of the Plaintiff with respect to management of the Shopping Center.  Among other things,

the Defendant opened a bank account with First Tennessee Bank in the name of Briarcliff

Management Co. II (Operating Account) to serve as the Operating Account for the Shopping Center,

*see* COLL. TRIAL EX. 8, and he initially provided the Plaintiff with monthly statements of the

Shopping Center's cash receipts and disbursements, but over time, the statements were sent quarterly

or as Ms. Power requested them.  The Defendant also sent the financial statements to the Plaintiff's

Certified Public Accountant, Mark Zuckerman, with the firm of Coulter & Justus.  Additionally, over

10

the nine years that the Defendant managed the Shopping Center for the Plaintiff, he made loans to the Plaintiff's Operating Account from his various businesses. These loans were reflected as "Loans Payable" in the liabilities section of the financial statements provided to the Plaintiff by the Defendant and were not questioned by Ms. Power. *See* COLL. TRIAL EX. 12. During that time as well, in order to infuse additional income into the Shopping Center for tenant improvements, the Plaintiff obtained a $200,000.00 line of credit with Citizens National Bank in July 2007, against which the Defendant was authorized to request draws and did so, accumulating an obligation as of June 15, 2010, in the amount of $195,958.74. COLL. TRIAL EX. 3.

In July 2009, Ms. Power received notice through two letters dated July 8, 2009, from LNR Partners, Inc., servicer for Wells Fargo Bank, N.A., successor to Bridger Commercial Lending, and received a telephone call advising that the Plaintiff's mortgage obligation on the Shopping Center was in default. TRIAL EX. 23; TRIAL EX. 24. After receiving these letters, Ms. Power contacted the Defendant, who explained that the Plaintiff was having cash flow issues. The Plaintiff thereafter engaged attorney Joshua Bishop, who entered into discussions with LNR Partners, Inc. and Wells Fargo Bank, N.A. to renegotiate the terms of the Promissory Note on the Plaintiff's behalf. As reflected on the Statement of Mortgage Debt dated August 14, 2009, the mortgage obligation was in default for May, June, July, and August 2009, and could be brought current by paying $166,338.47. COLL. TRIAL EX. 26. Although it would not accept regular monthly maintenance payments after the default, the Plaintiff made – and the lender accepted – two lump sum payments totaling $50,000.00; however, the Plaintiff was unable to negotiate new terms for the Promissory Note.

Upon learning that BACM 2001-1 Kingston Pike Retail, LLC, successor in interest to Wells Fargo Bank, N.A., was planning to put the Shopping Center into receivership, Ms. Power contacted the Defendant, advised him that upon advice of her attorneys, she was taking over management of the Shopping Center, and made arrangements to retrieve the Plaintiff's financial documentation. On June 7, 2010, Ms. Power and her husband went to the Defendant's office and were given two boxes containing all of the financial documentation in the Defendant's possession including deposit slips, check stubs, bank statements, a few invoices, and Knoxville Utilities Board bills. In addition, the Defendant gave Ms. Power a check in the amount of $28,989.32, representing the balance of the Plaintiff's Operating Account minus a check in the amount of $61,842.53 that the Defendant wrote himself as reimbursement for the balance of monies he had loaned the Plaintiff. *See* COLL. TRIAL EX. 8.

The Plaintiff filed the Voluntary Petition commencing its Chapter 11 bankruptcy case on June 8, 2010. On July 6, 2011, an Order Confirming Plan of Reorganization was entered, confirming the Amended Plan of Reorganization of Lingham Rawlings, LLC dated May 2, 2011, as modified by the Modified Amended Plan of Reorganization of Lingham Rawlings, LLC dated June 22, 2011. The confirmed plan specifically preserved prosecution of this adversary proceeding which was commenced in the bankruptcy court on November 11, 2010, prior to confirmation of the plan.

Pursuant to the Joint Statement of Issues filed on July 16, 2012, amended on July 20, 2012, and July 27, 2012, the issues to be decided are as follows:

1. Whether the Defendant breached the Management Agreement entered into between the Plaintiff and the Defendant, resulting in damage to the Plaintiff.

2.  Whether the Defendant fraudulently concealed the financial affairs of the Plaintiff from the Plaintiff, including whether the Defendant fraudulently concealed that payments were not being made on debt service, resulting in damage to the Plaintiff.

3.  Whether the Defendant converted funds of the Plaintiff, resulting in damage to the Plaintiff.

4.  Whether the Defendant owed fiduciary duties to the Plaintiff and, if so, whether the Defendant breached any such duties, resulting in damage to the Plaintiff.

5.  Whether the Defendant was professionally negligent, resulting in damage to the Plaintiff.

6.  With respect [to] each of the above issues, the dollar amount of damage incurred by the Plaintiff.

7.  Whether the Defendant was the recipient of fraudulent transfers from the Plaintiff pursuant to 11 U.S.C. § 548(a)(1)(B) or pursuant to 11 U.S.C. § 544(b)(1), applying Tenn. Code Ann. §§ 66-3-305 and 66-3-306(a).  If so, what is the dollar amount of any such transfers and are such transfers avoidable pursuant to 11 U.S.C. § 548(a)(1) and 11 U.S.C. § 544(b)(1) and recoverable under 11 U.S.C. § 550(a)(1)?

8.  Whether, alternatively, the Defendant was the recipient of preferential payments from the Plaintiff.  If so, what is the dollar amount of such transfers and are such transfers avoidable pursuant to 11 U.S.C. § 547(b) and recoverable under 11 U.S.C. § 550(a)(1)?

9.  Whether, in the event the Defendant was the recipient of avoidable preferential payments from the Plaintiff, those preferential payments are non-avoidable as a result of the "ordinary course of business" defense.

10.  Whether the Plaintiff is entitled to punitive damages.

11.  Whether the Plaintiff is entitled to its reasonable attorneys' fees and expenses.

AM. JT. STMT. OF ISSUES.  On July 27, 2012, the Plaintiff also filed the Motion of Plaintiff to Exclude

Certain Exhibits Proffered by Defendant and to Exclude Testimony (Motion to Exclude), asking the

court to exclude Trial Exhibits 27 and 29 as well as any testimony offered in relation to these

exhibits.  In response, the Defendant filed Defendant's Response to Plaintiff's Motion to Exclude

Certain Exhibits and to Exclude Testimony (Defendant's Response to Motion to Exclude) on July 30, 2012.

During trial, at the close of the Plaintiff's proof, the Defendant made an oral motion to dismiss the Plaintiff's causes of action for preferential transfers under § 547(b) and fraudulent conveyances under §§ 544(b)(1) and/or 548(a)(1)(B) on grounds that the Plaintiff had not satisfied the insolvency requirements under each, to dismiss the Plaintiff's causes of action under fraudulent concealment, professional negligence, breach of fiduciary duties, and conversion because they are tort claims being asserted in a breach of contract case, and to deny the Plaintiff's requests for punitive damages and attorney's fees. The Defendant also made an oral Motion to Strike the portion of Mr. Costello's testimony concerning "excess maintenance expenses" and Trial Exhibits 31 and 35, arguing that it was not an item of damages prayed for in the Complaint or identified in the Plaintiff's initial disclosures. The court deferred ruling on the Motion to Exclude and oral motions until the close of proof. On August 15, 2012, the Plaintiff filed Plaintiff's Post-Trial Brief Regarding Defendant's Exhibits 27 and 44 and the Post-Trial Brief of Plaintiff. The court will address each of the foregoing motions within the context of this Memorandum Opinion.

## II
## A.  MOTION TO EXCLUDE

In its Motion to Exclude, the Plaintiff asks the court to exclude Trial Exhibits 27 and 29 along with any testimony related thereto, arguing that these exhibits include information that the Plaintiff requested during discovery that the Defendant refused to supply although requested through

both interrogatories and requests for production of documents.  With respect to Trial Exhibit 27, the

Plaintiff makes the following averments:

> 3.   In Defendant's Response to Plaintiff's First Requests for Production of Documents and Tangible Things, the Defendant refused to produce any bank records of Gaudiano, Station West, and other entities controlled by Gaudiano, stating that the records were "unnecessary" and "irrelevant."

> 4.   Documentation of any checks written on the account of Station West for the benefit of the Plaintiff was within the scope of Interrogatory No. 4 in Plaintiff's First Interrogatories.   However, the Defendant advised in Defendant's Response to Plaintiff's First Interrogatories that he did not have any documentation of "advances" made by himself or his entities other than the Lingham Rawlings account check stubs and statements that were retrieved by Ms. Power, the Plaintiff's chief manager, just prior to the bankruptcy filing.

> 5.   Despite having stated in the discovery responses that he had no documentation and having indicated that bank information of Gaudiano, Station West, and other entities controlled by the Defendant was "unnecessary" and "irrelevant", the Defendant now seeks to testify about, and present an exhibit summarizing, alleged checks written on an account of Station West made to third-parties.

> 6.  Copies of the alleged checks written on the account of Station West have never been provided to the Plaintiff (or any other documentation of such payments), either through discovery responses or initial disclosures.   The Plaintiff has no way to determine whether the checks were in fact written or whether the products or services delivered by the payee of such checks were in fact for the benefit of the Plaintiff.

MOT. TO EXCLUDE at 2-3.  Additionally, the Plaintiff referenced Defendant's Response to Plaintiff's

First Requests to Defendant for Production of Documents and Tangible Things wherein the

Defendant stated that "[p]roducing bank statements of 'Station West' . . . is an unnecessary and

overbroad request, is irrelevant and not reasonably calculated to lead to the discovery of admissible

evidence, and would subject Defendant to an annoying and undue burden or expense."  TRIAL EX. 7

at ¶ 15.  The Plaintiff also referenced Defendant's Response to Plaintiff's First Interrogatories, which

was introduced into the record as Trial Exhibit 6, as evidence of the Defendant's failure to provide

the requested information during discovery.  In response, the Defendant argues, through Defendant's

Response to Motion to Exclude, that Trial Exhibit 27 simply summarizes information set forth in

Collective Trial Exhibits 11 and 12, which were provided to the Plaintiff through his initial

disclosures and/or the discovery process.

The Plaintiff renewed its objection to this exhibit and to supporting testimony at trial, during

the Defendant's direct examination, and the court directed the Defendant to file a post-trial summary

attaching the supporting documentation from Collective Trial Exhibit 11 with respect to any Station

West references.  Accordingly, on August 8, 2012, the Defendant filed Late-Filed Exhibit 44 which

incorporates a copy of Trial Exhibit 27 with handwritten notations identifying twenty-six

transactions involving Station West followed by excerpts from Collective Trial Exhibit 11 with

handwritten notations to identify the entries corresponding to those on Trial Exhibit 27.  Thereafter,

on August 15, 2012, the Plaintiff filed Plaintiff's Post-Trial Brief Regarding Defendant's Exhibits 27

and 44.  On August 30, 2012, the Defendant filed his Response to Docket Entries 81 and 82, stating

that he would address the Plaintiff's post-trial arguments with respect to these trial exhibits in his

Proposed Findings of Fact and Conclusions of Law.

Based upon a review of Collective Trial Exhibit 11, Trial Exhibit 27, and Late-Filed

Exhibit 44, the court finds that Trial Exhibit 27 is, in fact, a summary of some of the information that

is contained – albeit not easily discernable – within Collective Trial Exhibit 11.  Nevertheless, Trial

Exhibit 27 also contains information that, as expounded upon through Late-Filed Exhibit 44, relates

to Station West loans that does not have corresponding entries within Collective Trial Exhibit 11

including notations to check numbers for Station West.  That information clearly came from a

different source, most likely Station West's bank records, which were specifically sought during

discovery and not provided in response to the Plaintiff's request for the production of documents as

being "unnecessary", "irrelevant[,] and not reasonably calculated to lead to the discovery of

admissible evidence[.]"  TRIAL EX. 7 at ¶ 15.  Similarly, the Plaintiff propounded the following

interrogatories to the Defendant which appear to ask for the very information that is summarized

within Trial Exhibit 27:

> 4.  Identify each "advance" the Defendant alleges it made to Lingham Rawlings, LLC
> (including those referred to in paragraph 19 of the Answer) by stating the date of the
> advance, the amount of the advance, the form of the advance (whether cash, check,
> etc.), and identify the person requesting the advance.
>
> 5.  As to each "advance" identified in response to Interrogatory No. 4, state whether
> such advance was repaid or reimbursed, the date of repayment or reimbursement, the
> form of repayment or reimbursement, and from whom the repayment or
> reimbursement was received.

TRIAL EX. 6 at ¶¶ 4-5.  In response to question four, the Defendant provided the following response:

> The information requested may be determined from documents already in the
> possession of Plaintiff, and/or from documents being made available by Defendant,
> and the burden is equal upon Plaintiff or Defendant to ascertain such information
> from those documents.  Further, after the filing of Plaintiff's Chapter 11 bankruptcy
> case, but before the filing of this adversary proceeding, Plaintiff went to Defendant's
> office and retrieved from Defendant virtually all of Defendant's documents with
> respect to the subject shopping center, including but not limited to bank statements,
> check stubs, canceled checks, rent rolls, receipts, invoices, and other similar
> documents.  In essence, Plaintiff retrieved from Defendant all of Defendant's
> documents but for the general ledgers which are being produced in connection with
> these discovery responses.  Accordingly, information regarding any such advances
> is in the possession of Plaintiff.  Any advances were made by check.

TRIAL EX. 6 at ¶ 4.  His response to question five was identical other than omission of the last

sentence that all advances were made by check.  *See* TRIAL EX. 6 at ¶ 5.  Nevertheless, the Defendant

did not provide this information to the Plaintiff until July 23, 2012, when the parties were preparing exhibits to be jointly pre-marked prior to trial.

Accordingly, the Plaintiff's Motion to Exclude will be granted in part and denied in part as follows. Because the corresponding handwritten notations on the pages included within Collective Trial Exhibit 11 for the transactions marked on Late-Filed Exhibit 44 circled as numbers 1 through 8 reference "SW" and can be loosely identified as concerning Station West, the court will consider the information contained in the first five columns providing the check number, the date the check was written, the amount loaned, the amount repaid, and the account balance for those transactions.[3] The court will not, however, consider any of the information concerning transactions circled as numbers 9 through 26 on Late-Filed Exhibit 44, nor will the court consider any of the notations in the unnamed sixth column of Trial Exhibit 27 for any of the transactions, although the information contained in the first four columns will be considered. The final column notations contain references to specific Station West check numbers, information that is not found anywhere within Collective Trial Exhibit 11 but should have been provided in response to Interrogatories 4 and 5 of Plaintiff's First Interrogatories and would be found in the Station West bank records which the Defendant did not produce on the basis that they were "unnecessary", "irrelevant[,] and not reasonably calculated to lead to the discovery of admissible evidence[.]" TRIAL EX. 7 at ¶ 15.

---

[3] The court feels it necessary to point out that the handwritten notations found within Collective Trial Exhibit 11 are barely legible and do not easily identify loans made by Station West and repaid through the Debtor's Operating Account. In fact, the court would not have been able to match any of the corresponding "loans" identified as numbers 1 through 8 without the summary provided by Trial Exhibit 27 and explained through Late-Filed Exhibit 44.

The Plaintiff next argues that Trial Exhibit 29 contains information and calculations that are responsive to the Plaintiff's expert report and is, thus, impermissible lay testimony under the Federal Rules of Evidence, making the following averments:

> 10.  This exhibit "summarizes" certain repair and maintenance expenses (stated to be from financial statements) not only for the period during the Defendant's management but also for years 1996-2000, prior to Plaintiff's acquisition of the shopping center.  No financial statements for the period 1996-2000 have ever been provided to the Plaintiff and none are identified as exhibits for trial.  In other words, this demonstrative exhibit summarizes information from financial statements that will not be in evidence.  The Plaintiff has no way of confirming whether the information on the exhibit is correct.

> 11.  Exhibit # 29, however, is not merely a summary.  The exhibit not only contains various calculations but also contains an analysis of the costs per square foot for operating the shopping center.  Such information violates the limits on lay testimony under Fed. R. Evid. 701.

MOT. TO EXCLUDE at 3.  With respect to Trial Exhibit 29, the Defendant responded to the Plaintiff's Motion to Exclude by stating that it is merely a summary and calculation of information contained in Trial Exhibits 11 and 12.  In addition, he argues that "[b]y virtue of his 'relationship' with the building at issue, and by virtue of his ownership and management of same for over 15 years, Defendant has knowledge of facts which, upon the laying of a proper foundation at trial, should be admissible."  DEF.'S RESP. TO MOT. TO EXCLUDE at 2.  Trial Exhibit 29, however, was not introduced into the record and therefore, the Motion to Exclude with respect to that trial exhibit shall be denied as moot.

## B.  MOTION TO STRIKE

The Defendant's Motion to Strike the portion of Mr. Costello's testimony concerning "excess maintenance expenses" and Trial Exhibits 31 and 35 is grounded upon the Plaintiff's failure to

specifically identify "excess maintenance expenses" as a portion of his requested damages in either

the Complaint or the initial Rule 26(a) disclosures provided by the Plaintiff.  Rule 26 of the Federal

Rules of Civil Procedure requires, in material part:

> (A) *In General.*  Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated
> or ordered by the court, a party must, without awaiting a discovery request, provide
> to the other parties:
>
> . . . .
>
> (iii) a computation of each category of damages claimed by the disclosing
> party – who must also make available for inspection and copying as under
> Rule 34 the documents or other evidentiary material, unless privileged or
> protected from disclosure, on which each computation is based, including
> materials bearing on the nature and extent of injuries suffered[.]

FED. R. CIV. P. 26(a)(1).  Courts have broad discretion to exclude untimely expert witness testimony

pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, which provides, in material part,

that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e)[4],

the party is not allowed to use that information or witness to supply evidence on a motion, at a

hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ.

P. 37(c)(1); *see also Tomlinson v. Collins*, 2011 WL 478835, at 2, 2011 U.S. Dist. LEXIS 11372,

at *6 (S.D. Ohio Feb. 7, 2011) ("[A] trial judge should not exclude expert testimony unless the

failure to disclose testimony or to supplement such disclosures is both unjustified and harmful . . .

[and t]he failure to provide the information earlier . . . result[s] in prejudice.") (citations omitted).

---

[4] Subsection (a) of Rule 26 governs the duty of disclosure and provides the general provisions governing
discovery.  Subsection (e) requires parties to supplement disclosures and responses to the extent they are incomplete
and/or additional information is discovered.

In response to the Motion to Strike, the Plaintiff argues that it first disclosed that it was seeking to recover losses arising from excessive and unsupported amounts for expenses as a component of its damages in the Complaint by alleging that the Defendant reimbursed himself for expenses he did not advance, for amounts exceeding those he advanced, and amounts he overpaid himself for compensation and reimbursements. The Plaintiff also argued that this component of damages was disclosed in its initial Rule 26 disclosures which stated that it was seeking to recover "amounts that Defendant overpaid himself in compensation and reimbursements[,]" POST-TRIAL BRIEF OF PL. at ¶ 2 (quoting PL.'S INITIAL DISCLOSURES at ¶ 3(a)), and restated in the Trial Brief of Plaintiff filed on July 24, 2012, prior to trial. Finally, the Plaintiff argues that these damages were specifically quantified by Mr. Costello in his report which was served on the Defendant on November 4, 2011.

With respect to actual damages, the Complaint states simply "[t]hat Plaintiff be awarded money damages, including interest; . . . costs, attorneys' fees and expenses; . . . [and] treble and/or punitive damages[.]" TRIAL EX. 41 at ¶ 14. It also, however, as asserted by the Plaintiff, alleges that the Defendant "reimbursed himself for expenses he did not advance or in an amount exceeding advanced amounts [and] paid himself compensation to which he was not entitled[,]" causing the Plaintiff to lose the "benefit of its bargain including, among other damages: . . . the amounts that Defendant overpaid himself in compensation and reimbursements[.]" TRIAL EX. 41 at ¶¶ 16-17. With respect to the Plaintiff's Initial Rule 26(a) Disclosures, which was entered into the record as Trial Exhibit 42, the Plaintiff disclosed that it sought the following damages:

> a. Rents, profits, proceeds and/or products generated by the shopping center owned by Lingham Rawlings, LLC, the amounts the Defendant overpaid himself in

compensation and reimbursements, the amounts that Defendant transferred to "Miners," ["]Station West," and other individuals or entities which were not owed, the amounts of increased interest and penalties that were assessed as a result of Defendant's late payments for waste management services, local taxes, and utilities, plus interest.

      b.   Interest, late fees, and other penalties paid to the lender and various vendors which would not have been required to be paid but for the Defendant's malfeasance.

      c.   All expenses paid by the Plaintiff arising out of the bankruptcy case, including Plaintiff's attorneys' fees and expenses and the attorneys' fees and expenses of lender's counsel, plus interest.

      d.   Treble damages and punitive damages.

      e.   Attorneys' fees, expenses, and costs incurred by the Plaintiff in prosecuting this adversary proceeding.

TRIAL EX. 42 at 4.  The fact that the Complaint and the initial disclosures do not expressly identify "excessive maintenance expenses" as a component of the amounts the Plaintiff alleges the Defendant overpaid himself "in compensation and reimbursements" does not negate those expenses as a portion of the damages sought.  Furthermore, Mr. Costello's report, which was tendered to the Defendant on November 4, 2011, expressly identifies those expenses and provided the Defendant with more than adequate notice.  The Defendant has not been prejudiced, and the Motion to Strike will be denied.  Mr. Costello's testimony and Trial Exhibits 31 and 35 remain in the record.

## C.  MOTION TO DISMISS

As discussed, at the close of the Plaintiff's proof, the Defendant made an oral motion to dismiss the Complaint with respect to all of the Plaintiff's claims except breach of contract.  In making the motion to dismiss, the Defendant's counsel cited to Rule 41(b) of the Federal Rules of

Civil Procedure which is made applicable in adversary proceedings by Rule 7041 of the Federal

Rules of Bankruptcy Procedure and provides:

> **Involuntary Dismissal; Effect**.  If the Plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it.  Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule – except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19 – operates as an adjudication on the merits.

FED. R. CIV. P. 41(b).  The Plaintiff's reliance on this Rule appears to be misplaced and based upon

the former Rule 41(b), which, prior to revision in 1991, provided that

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

FED. R. CIV. P. 41(b) (revised 1991); *see also duPont v. S. Nat'l Bank of Houston*, 771 F.2d 874, 879

(5th Cir. 1985) ("Rule 41(b) dismissal is warranted when the district court, even before hearing the

defendant's evidence, determines that the plaintiff has failed to offer persuasive evidence regarding

the necessary elements of his case.").  Instead, a defendant's "motion to dismiss under Rule 41 on

the ground that a plaintiff's evidence is legally insufficient should now be treated as a motion for

judgment on partial findings as provided in Rule 52(c)."  FED. R. CIV. P. 41 ADV. COMM. NOTES.

Under Rule 52(c),

> (c) **Judgment on Partial Findings**. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

FED. R. CIV. P. 52(c).  Following counsels' arguments in favor and in opposition of the motion to

dismiss, the court stated that it would not make a determination until after the close of both parties'

proof.  The court will now consider each of the actions addressed by the motion to dismiss, with the

exception of punitive damages and attorneys' fees, before making its determination on the breach

of contract issue – which the Defendant did not seek to dismiss – and any damages thereunder.

### i.  Preferential Transfer

For this cause of action, the Plaintiff contends that the Defendant made a number of transfers

that are avoidable preferences and recoverable by the Plaintiff for the benefit of the bankruptcy

estate.  Pursuant to 11 U.S.C. § 547(b), in tandem with 11 U.S.C. § 1107(a) (2006), a debtor-in-

possession in a Chapter 11 bankruptcy case may avoid transfers made to creditors if the following

requirements are satisfied:

> (b)  Except as provided in subsections (c) and (i) of this section, the trustee may
> avoid any transfer of an interest of the debtor in property —
>
>> (1) to or for the benefit of a creditor;
>>
>> (2) for or on account of an antecedent debt owed by the debtor before such
>> transfer was made;
>>
>> (3) made while the debtor was insolvent;
>>
>> (4) made —
>>
>>> (A) on or within 90 days before the date of the filing of the petition;
>>> or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider[5]; and

(5) that enables such creditor to receive more than such creditor would receive if —

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  Correspondingly, "to the extent that a transfer is avoided under section 544, . . . 547, . . . [or] 548 . . ., the trustee may recover, for the benefit of the estate, the property transferred . . . [.]" 11 U.S.C. § 550(a)(1) (2006).  The Plaintiff avers that multiple transfers made between March 10, 2010, and the filing date by the Defendant to himself, including the $61,892.53 check the Defendant wrote on the day before the bankruptcy case was filed, were preferences and should be avoided.  The Defendant seeks dismissal of the Plaintiff's cause of action for preferential transfer, arguing that he has rebutted the statutory presumption of insolvency and that the Plaintiff has failed to prove that it was, in fact, insolvent.

As an initial matter, based upon the record before it, the court finds that there is no real dispute that transfers totaling $83,752.07 that the Defendant made to himself from funds belonging

---

[5] The court notes that the Plaintiff did not address the insider question nor did it address any of the § 547 preference issues in its Proposed Findings of Fact and Conclusions of Law.  Nevertheless, as it applies in this adversary proceeding, the Bankruptcy Code defines an "insider" of a corporation to include "(iii) person in control of the debtor; [and] . . . (F) managing agent of the debtor."  11 U.S.C. § 101(31) (2006).  Based upon the parties' Management Agreement and the testimony at trial, there is no real dispute that the Defendant, doing business as Briarcliff Management, was the managing agent of the Shopping Center, which was owned by the Plaintiff.  The Defendant was not, however, the person in control of the Plaintiff, nor was he the Plaintiff's managing agent.  He was, therefore, not an insider of the Plaintiff.  Accordingly, the look-back period is ninety days preceding the filing date of the Plaintiff's Voluntary Petition, or May 1, 2010.

to the Plaintiff between March 10 and June 8, 2010, were made for the benefit of the Defendant, were on account of an antecedent debt, were made within ninety days before the date that the Plaintiff's bankruptcy case was filed, and enabled the Defendant to receive more than he would have received – as a general unsecured creditor – in a case under Chapter 7. The Bankruptcy Code defines a "transfer" as, *inter alia*, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D) (2006). Unquestionably, the following payments of money from the Plaintiff's Operating Account to the Defendant constituted transfers of property or an interest in property for the Defendant's benefit within the ninety days prior to June 8, 2010: (1) check no. 3172 payable to Station West in the amount of $10,000.00 dated March 10, 2010; (2) check no. 3200 payable to Station West in the amount of $10,000.00 dated April 12, 2010; (3) check no. 3202 payable to Miners in the amount of $1,209.46 dated April 12, 2010; (4) check no. 3242 payable to Miners in the amount of $650.08 dated May 20, 2010; and (5) check no. 3262 payable to Station West in the amount of $61,892.53 dated June 7, 2010. *See* COLL. TRIAL EX. 21 at Ex. B. The Defendant testified that the payments were to repay loans that he made to the Plaintiff and for payment of his compensation past-due under the Management Agreement, both instances falling within the definition of an antecedent debt – a debt "incurred before the allegedly preferential transfer." *Homann v. R.I.H. Acquisitions In, LLC (In re Lewinski)*, 410 B.R. 828, 836 (Bankr. N.D. Ind. 2008); *see also Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless Cashways, Inc.)*, 306 B.R. 243, 256 (B.A.P. 8th Cir. 2004) ("A debt is incurred 'on the date upon which the debtor first becomes legally bound to pay.'") (quoting *Jones Truck Lines, Inc. v. Cent. States, SE & SW Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 329 (8th Cir. 1997) (citations omitted)).

Accordingly, the sole remaining issues concerning whether or not these transfers were avoidable preferences are whether the transfers were made while the Plaintiff was insolvent and whether the transfers allowed the Defendant to receive more than he would have in a Chapter 7 liquidation.

As it relates to preferences, the Bankruptcy Code defines "insolvent" as:

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of –

> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

> (ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32)(A) (2006). "[I]nsolvency is determined through 'a balance sheet test': whether liabilities exceed assets, 'excluding the value of preferences, fraudulent conveyances and exemptions.'" *BankEast v. Shirley (In re Shirley)*, 2011 WL 4054773, at *5, 2011 Bankr. LEXIS 3496, at *12-13 (Bankr. E.D. Tenn. Sept. 12, 2011) (quoting *Webb Mtn, LLC v. Exec. Realty P'ship, LP (In re Webb Mtn, LLC)*, 414 B.R. 308, 355 (Bankr. E.D. Tenn. 2009) (citations omitted)). To state it another way, "insolvency is measured with reference to the 'fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.'" *Cellmark Paper, Inc. v. Ames Merch. Corp. (In re Ames Dep't Stores, Inc.*), 470 B.R. 280, 283 (S.D.N.Y. 2012) (quoting *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996)). "Most courts define 'fair valuation' to require a debtor's assets to be valued based on a going concern value, unless the debtor is on its 'deathbed,' in which case

liquidation value is used." *Intercont'l Polymers, Inc. v. Equistar Chemicals, LP (In re Intercont'l Polymers, Inc.*), 359 B.R. 868, 873 (Bankr. E.D. Tenn. 2005).

With respect to the insolvency issue within the context of preferences, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f) (2006). Nevertheless, the presumption of insolvency may be rebutted by the introduction of "some evidence to show that the debtor was solvent *at the time of the transfer*[.]" *Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Nat'l Gas Corp.*, 158 F.3d 312, 315 (5th Cir. 1998) (emphasis in original). "If the creditor introduces such evidence, then the trustee must satisfy its burden of proof of insolvency by a preponderance of the evidence." *Roblin Indus., Inc.*, 78 F.3d at 34. In order to rebut the statutory presumption of insolvency, "mere speculative evidence of solvency is not enough." *Gasmark Ltd. Liquidating Trust*, 158 F.3d at 315.

> The Code's definition of insolvency applies a balance sheet test, which requires the court to engage in the 'fair valuation' of the debts and property shown on the debtor's balance sheet. But a fair value might not be reflected by what the debtor reports on its books. The court must determine the debts that would have to be paid in a market analysis.

*Off. Employment-Related Issues Comm. of Enron Corp. v. Arnold (In re Enron Corp.)*, 318 B.R. 655, 662 (Bankr. S.D. Tex. 2004).

> As the statutory definition of insolvency makes clear, establishing solvency requires evidence of the value of Ames' assets and liabilities (and especially the former) *at a fair market value*. Cellmark relies, for this purpose, on Ames books and records as of the time of its filing. But like so many financial statements published by corporate debtors, Ames' financial statements were historic, based principally on acquisition cost and any applicable depreciation. Financial statements' showings as to assets and liabilities (and especially assets) are not necessarily (and rarely are) reflective of actual fair market value, especially in industries where assets need not be "marked to market." The schedules of assets and liabilities filed by Ames at the outset of its chapter 11 case clearly stated that they listed merely the *book value* of

Ames' assets and liabilities, and that Ames could not obtain "current market valuations." Evidence of the book value of assets is insufficient to rebut the presumption of insolvency.

Cellmark's assertions that omissions in Ames' financial statements support Ames' solvency are without merit. Cellmark misses the point that Ames' statements do not include $200 million of bond debt that Ames guaranteed to its corporate parent. But apart from that, Cellmark's reliance only on statements of assets and liabilities was insufficient to rebut the presumption of insolvency. Cellmark offered no evidence of the fair market value of Ames' merchandise inventory, or other, less valuable, assets. Because the Court finds that Ames' financials by definition do not represent the fair market value of Ames' assets and liabilities, and Cellmark has not offered any additional evidence of Ames' assets and liabilities, the presumption of insolvency has not been rebutted, and the Debtors have established insolvency under section 547(b)(3) of the Code.

*Ames Merch. Corp. v. Cellmark Paper Inc. (In re Ames Dep't Stores, Inc.)*, 450 B.R. 24, 31-32 (Bankr. S.D.N.Y. 2011) (footnotes and citations omitted). Accordingly, inferences may be drawn from book values and a debtor's statements and schedules; "[h]owever, 'book values are not ordinarily an accurate reflection of the market value of an asset[,]' and schedules or other financial documents based on the book value of the debtor's assets have generally been deemed insufficient to rebut the presumption of insolvency[.]" *Ames Dep't Stores, Inc.*, 470 B.R. at 283-84 (quoting *Roblin Indus., Inc.*, 78 F.3d at 36), *aff'd*, *Cellmark Paper Inc. v. Ames Merch. Corp. (In re Ames Dep't Stores, Inc.)*, 2012 WL 6684567, at *2, 2012 U.S. App. LEXIS 26335, at *4 (2d Cir. Dec. 26, 2012) ("Book value may be relevant in determining fair value, but it does not compel the fact finder to draw an inference of solvency."). Likewise, "[b]ecause book value is not probative of the issue of fair market valuation, the schedules are insufficient to rebut the statutory presumption of insolvency." *Intercont'l Polymers, Inc*, 359 B.R. at 873; *but see Fokkena v. Winston, Reuber, Byrne, P.C. (In re Johnson)*, 189 B.R. 744, 747 (Bankr. N.D. Iowa 1995) ("Information from a debtor's schedules has been held sufficient to rebut the presumption of insolvency.").

In support of his assertion that he has rebutted the presumption of insolvency, the Defendant has advanced the following arguments: (1) the balance sheet dated December 31, 2009, prepared by the Defendant reflects that the Plaintiff's assets totaled just over $2,500,000.00 compared to total liabilities of approximately $1,800,000.00 just six months prior to the bankruptcy filing; (2) the Plaintiff's statements and schedules filed at the commencement of its case reflected assets of $2,033,339.24 and liabilities of $2,092,235.80 but did not include any value for impound/escrow funds in the amount of $160,000.00 being held by the Plaintiff's lenders; (3) the Plaintiff has insured the Shopping Center for $2,745,000.00 rather than the scheduled value of $2,000,000.00, evidencing a higher valuation than reflected in the statements and schedules; and (4) the Plaintiff's monthly operating reports include comparative balance sheets which reflect that its assets exceed its liabilities. In the event the court found that the Defendant successfully rebutted the presumption, requiring the Plaintiff to prove that it was, in fact, insolvent on or before ninety days before it filed for bankruptcy, the Plaintiff has argued that at the time of the Defendant's transfers to himself, the fair market value of the Shopping Center – its only asset – was less than the amount of the debt it secured, and because the Plaintiff could not make its mortgage payments for May, June, July, and August 2009, it was unable to pay its debts as they came due and was equitably insolvent as of May 1, 2009.

Although the court may draw inferences therefrom, none of the foregoing documentation relied upon by the Defendant is sufficient to rebut the statutory presumption provided the Plaintiff through § 547(f). First, with respect to the balance sheets introduced into evidence as Collective Trial Exhibit 12 and summarized through Collective Trial Exhibit 12A, the Defendant correctly

argues that they reflect that the Plaintiff's assets were greater than its liabilities. Specifically, only two balance sheets are relevant concerning the Defendant's alleged preferential transfers, those for December 31, 2009 and June 30, 2010, which reflect the Plaintiff's total assets, liabilities, and capital comprised, respectively, of the following:

|  | December 2009 | June 30, 2010 |
|---|---|---|
| **ASSETS:** |  |  |
| cash | $ 36,264.89 | $ 32,689.32 |
| land | $ 450,000.00 | $ 450,000.00 |
| building | $ 2,329,693.27 | $ 2,329,693.27 |
| tenant improvements | $ 274,118.34 | $ 274,118.34 |
| accumulated depreciation | ($ 690,427.62) | ($ 731,432.80) |
| tenant property tax receivable | $ 4,140.57 | $ 0.00 |
| capital improvement escrow | $ 6,204.61 | $ 6,204.61 |
| tenant improvement escrow | $ 40,044.27 | $ 40,044.27 |
| debt service escrow | $ 46,500.00 | $ 46,500.00 |
| tax escrow | ($ 4,207.26) | ($ 24,266.26) |
| insurance escrow | $ 820.41 | ($ 4,645.59) |
| tenant electric rebates | $ 3,836.07 | $ 3,529.94 |
| utility deposits | $ 9,900.00 | $ 9,900.00 |
|  |  |  |
| TOTAL ASSETS | $ 2,506,887.55 | $ 2,432,335.10 |
|  |  |  |
| **LIABILITIES:** |  |  |
| mortgage payable | $ 1,725,743.21 | $ 1,725,743.21 |
| tenants' security deposits | $ 35,953.00 | $ 38,653.00 |
| prepaid rent | $ 0.00 | $ 0.00 |
| reserve for property tax | $ 20,059.00 | $ 20,059.00 |
| loans payable | $ 81,842.53 | $ 0.00 |
|  |  |  |
| TOTAL LIABILITIES | $ 1,863,597.74 | $ 1,784,455.21 |
|  |  |  |
| **CAPITAL:** |  |  |
| original investment | $ 806,031.03 | $ 806,031.03 |
| contributions | $ 129,000.00 | $ 129,000.00 |

| | | |
|---|---|---|
| retained earnings | ($   291,741.22) | ($   287,151.14) |
| TOTAL CAPITAL | $   643,289.81 | $   647,879.89 |
| TOTAL LIABILITIES AND CAPITAL | $  2,506,887.55 | $  2,432,335.10 |

COLL. TRIAL EX. 12; COLL. TRIAL EX. 12A.  Based upon each of the foregoing balance sheets, the

Plaintiff's assets were greater than its liabilities.   However, these balance sheets, which were

prepared by the Defendant, are based on the Shopping Center's book value and not on the Shopping

Center's fair market value as a going concern.   In fact, the values for the land and building are

identical to the values shown on the first balance sheet included within Collective Trial Exhibit 12

for March 31, 2001, and in Collective Trial Exhibit 12A for December 31, 2001, and while those

values are reduced by the accumulated depreciation, the values do not take into account the recent

economic difficulties which have affected not only property values but the viability of businesses

as well.  See COLL. TRIAL EX. 12; COLL. TRIAL EX. 12A.  In order to rebut the statutory presumption

that the Plaintiff was insolvent during the ninety days preceding the bankruptcy filing, the Defendant

was required to prove something more concrete with respect to the Shopping Center's current market

value compared to its current liabilities.

Additionally, the Defendant cannot rely upon the Plaintiff's monthly operating reports filed

subsequent to the bankruptcy filing, introduced into evidence as Collective Trial Exhibit 16, as a

basis for rebutting the presumption as these reports provide no evidence as to the financial condition

or valuation of the Shopping Center within the ninety days preceding the filing of the Plaintiff's

bankruptcy case.  Additionally, although these reports reflect that the Plaintiff's assets and liabilities

on the filing date were $2,361,918.00 and $2,092,236.00, respectively, the value of the assets were,

as with the financial statements prepared by the Defendant, based upon the book value, not its current market value. *See* COLL. TRIAL EX. 16. Likewise, the Defendant's reliance upon the Plaintiff's statements and schedules – which do, in fact, evidence on their face that the Plaintiff's liabilities were greater than its assets on the filing date, listing assets totaling $2,033,339.24 compared to liabilities totaling $2,092,235.80 – as anything more than an inference rather than an accurate reflection of the Plaintiff's solvency is misplaced.[6] As to the value of the Plaintiff's assets, at trial, Ms. Power testified that she believed that the $2,000,000.00 value for the Shopping Center in June 2010 was reasonable based upon the downturn in the real estate market over the past few years. While not considered an expert opinion under the Federal Rules of Evidence, based upon her thirty-two years experience as a licensed realtor, Ms. Power's opinion as to the Shopping Center's market value carries considerable weight. Finally, it is irrelevant that the Plaintiff insured the Shopping Center for $2,745,000.00 – which is the Shopping Center's book value for the building and real property as reflected in the balance sheets dating back to 2001 – rather than the $2,000,000.00 fair market value estimated by the Plaintiff and listed in its statements and schedules. It was reasonable for Ms. Power to insure the property based upon its book value when she purchased it in 2001, and at trial, she testified that she did not recall changing the insurance coverage on the Shopping Center since that time. In summary, the Defendant has not rebutted the presumption

---

[6] At trial, Ms. Power acknowledged that the Plaintiff's bankruptcy statements and schedules did not include approximately $160,000.00 in escrow funds for Taxes and Insurance Deposits, Tenant Improvement Deposits, Capital Improvement Deposits, and Debt Service Reserve deposits paid by the Plaintiff pursuant to the Promissory Note which were being held by BACM 2001-1 Kingston Pike Retail, LLC. These funds were the subject of the Plaintiff's adversary proceeding No. 11-3184 filed on June 21, 2011, against BACM 2001-1 Kingston Pike Retail, LLC and Square Mile/RAM Acquisition, LLC. *See* TRIAL EX. 39. The court takes judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, that this adversary proceeding was subsequently settled and dismissed pursuant to the Agreed Order of Dismissal of Adversary Proceeding With Prejudice entered on October 5, 2012.

of the Plaintiff's insolvency within the ninety days preceding the filing of its Voluntary Petition

under Chapter 11 on June 8, 2010.

Section 547(b)(5) requires the court to "construct a 'hypothetical Chapter 7 case;' i.e., to

determine what the [Defendant] would have received in a liquidation[, and u]nless the estate is

sufficient to provide a 100% distribution, any unsecured creditor . . . who receives a payment during

the preference period is in a position to receive more than it would have received under a Chapter 7

liquidation." *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465

(6th Cir. 1991); *see also Miller v. Fed. Deposit Ins. Co. (In re Miller)*, 428 B.R. 437, 446 (Bankr.

N.D. Ohio 2010) ("[I]f a debtor's estate has sufficient assets to provide a 100% distribution to all

unsecured creditors, no preference will exist.").   Because the court finds that the Plaintiff was

insolvent when the transfers occurred between March 10 and June 8, 2010, it also finds that it could

not have paid a 100% dividend to unsecured creditors, specifically the Defendant had the transfers

not been made, in a Chapter 7 liquidation.   Accordingly, these transfers allowed the Defendant, a

general unsecured creditor, to receive more than he would have received in a Chapter 7 liquidation.

Because the court has found that the transfers fall within the scope of § 547(b), the Defendant

has asserted the "ordinary course of business" defense which focuses upon the questioned

transactions between the parties and is statutorily defined as follows:

(c)  The trustee may not avoid under this section a transfer —

. . . .

(2)  to the extent that such transfer was in payment of a debt incurred by the
debtor in the ordinary course of business or financial affairs of the debtor and
the transferee, and such transfer was —

(A)  made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B)  made according to ordinary business terms[.]

11 U.S.C. § 547(c) (2006).  Although the Plaintiff has the burden of proving the elements of a preference, the Defendant, as the party asserting the § 547(c) statutory defense, bears the burden of proof that each element has been satisfied by a preponderance of the evidence.  11 U.S.C. § 547(g).

There is no specific test for determining whether payments were made in the ordinary course of business; instead, courts must engage in a factual analysis and determine "whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent." *Lightfoot v. Ameila Maritime Svcs., Inc. (In re Sea Bridge Marine, Inc.)*, 412 B.R. 868, 873 (Bankr. E.D. La. 2008).

> This defense has been interpreted to require the creditor asserting it to establish that the disputed payment was "ordinary" under both a subjective (as between the parties) and an objective (commercial practice) analysis.  The subjective analysis typically involves comparing preference period transactions with the parties' previous transactions with respect to four primary factors: 1) the length of time involved in the preference period transaction; 2) whether the amount or the form of that payment differed from previous practice; 3) whether that transaction involved any unusual collection or payment activity; and 4) the circumstances under which the transfer was made.

*Milk Palace Dairy LLC v. L & N Pump, Inc. (In re Milk Palace Dairy LLC)*, 385 B.R. 765, 769 (B.A.P. 10th Cir. 2008) (footnote omitted); *see also Stamat v. Neary*, 635 F.3d 974, 980 (7th Cir. 2011) ("[F]actors to consider include the length of time the parties were engaged in the type of transaction at issue, whether the amount or form of tender differed from past practices, and whether the debtor engaged in any unusual collection or payment activity.").  However, post-BAPCPA, "the statute allows either § 547(c)(2)(A) or § 547(c)(2)(B) to be used independently from each other as

a course of business defense regardless of the amount of prepetition conduct and history that exists between the parties. As the statute currently reads, it requires the creditor to carry the lighter burden of proving that the transfer was made in accordance with the standard practice between the parties or in accordance with the industry norms, but not both." *Sparkman v. Queenscape, Inc. (In re Anderson Homes, Inc.)*, 2012 WL 5617446, at *3, 2012 Bankr. LEXIS 5334, at *8-9 (Bankr. E.D.N.C. Nov. 15, 2012).

Although the Defendant referenced subsection (B), his arguments focus solely upon the ordinary business terms between himself and the Plaintiff.  He did not offer any evidence or testimony as to industry standards or norms.  Accordingly, because the Defendant has relied only upon the parties' previous dealings with each other, the court will focus solely upon whether the Defendant met his burden of proof with respect to subsection (A).  Based upon the evidence, the court finds that the Defendant did not satisfy his burden of proof that the payments he received within the preference period were made in the ordinary course of business.  The record reflects that the Defendant, throughout the time he managed the Shopping Center, advanced funds to the Plaintiff and then reimbursed himself as cash flow permitted.  At trial, the Defendant testified to the following with respect to these advances:

> Q. . . .[U]nder the Management Agreement were you required to advance any of your own money in connection with the operation of 7212 Kingston Pike?
>
> A.  No.
>
> Q.  Did you, in fact, though, advance your own money at times to operate 7212 Kingston Pike?
>
> A.  Yes.

Q.  Why did you do that?

A.  At first, the rents were – the mortgage was due on the 4th of the month and we would not be able to collect the rents by the 4th of the month.

So at first, it was an in and out and then it got to the point where the rents less the expenses, we had to make cash advances and I did that.  And I guess it was – I was done – I felt bad for Ms. Power because, I mean, she just bought the property from me and this really began in 2002 when I left and I moved from there.  It created a vacancy.  The property, the $121,000 a year that she was paying in excess of what I was paying and with me leaving, that was another $30,000 a year.  That's a $150,000 hit she was taking and the property just wasn't cash flowing.

. . . .

Q.  Now look at Section 4.1, please, of the Management Agreement.

A.  Yes.

Q.  Did Section 4.1 allow you to pay or reimburse yourself for expenses and costs of operating the premises and also for your compensation?

A.  Yes.

Q.  And did you do that over the course of time?

A.  Yes.

Q.  And when I say "over the course of time," from when to when, approximately?

A.  Well, I'd pay the operating expenses from, it would have been March of 2001 all the way up to June of 2010.

Q.  And when you started advancing your own money into this account because of the cash flow problems you just talked about – and we'll talk about here again in more detail – and you would reimburse yourself, over what period of time did that occur?

A.  It started in 2002 and, and it went up to 2009.

TR. at 287-89.  He further expounded upon this practice during his cross-examination:

Q.  Now going back to cash flow, Mr. Gaudiano, you've testified earlier that at some point the 7212 Kingston Pike building started having cash flow problems, correct?

A.  Correct.

Q.  And you started advancing money into the account for the management of that building, is that right?

A.  Yes.

Q.  Did you do that over the course of time?

A.  Yes.

Q.  As cash flow and cash permitted, would you reimburse yourself for those amounts?

A.  To the extent there was cash available.

TR. at 312-13, and again during his re-direct examination:

Q.  Over what period of time did you advance money to the Briarcliff II, or the Lingham Rawlings account?

A.  2002 through 2009.

Q.  And did you do that periodically over the course of those years?

A.  Yes.

Q.  Did you talk with Ms. Power about advancing money into the account?

A.  Yes.

Q.  Did you talk with her on one occasion or on more than one occasion about doing that?

A.  More than one occasion.

Q.  And what were the conversations like when you talked with her about advancing the money?

A.  At one time I asked her for money and she had given me $9,000 and then she said she doesn't have any more money.  And so I was putting money in and then in 19, or 2006 when we were going to go through major improvements I explained to her I can't put any, any more big money into this.  At that point I asked her to go out and see if she can get a loan, which she did.

She went and got a loan and advanced me at that time, I believe it was $45,000, which I used to do the tenant improvements.

Q.  After she obtained that loan, did you continue to have to advance money into the Lingham Rawlings account?

A.  Smaller amounts.

Q.  Did you have discussions with her about those advances as well?

A.  Yes.

Q.  And over this same course of time as cash and as cash flow permitted, did you reimburse yourself from time to time for those advances?

A.  Yes.

. . . .

Q.  And these advances into the account and repayments out of the account, those took place during your usual business with Lingham Rawlings and with Ms. Power, correct?

A.  Yes.

TR. at 322-23.  The Defendant also testified that he had advanced monies with respect to the

Shopping Center property even before he owned it, agreeing that "it was normal" for him to advance

money and be repaid when cash flow allowed.  TR. at 288.

On the other side, however, Ms. Power testified that she had not specifically known that the

Defendant advanced funds into the Operating Account, that she had not received any invoices from

the Defendant that he was owed money, and that she was only aware that there were alleged loans

payable after being asked about it by her accountant:

Q.  Okay.  Were you aware of any debt, or alleged debt to Mr. Gaudiano at that time?

A.  I was not aware other than my CPA had said to me at tax time, "There is a loans payable that has been turned in."  And I said, "What is it for?"

Q.  Okay.  Which tax time was this?  Was it the most recent tax period?

A.  No, not the one we just went through, but the one prior –

Q.  Okay.

A.  – which would have been 2000 –

Q.  Okay.

A.  Would that have been 2009 taxes?

Q.  Okay.  Did – okay.  So he mentioned the loans payable.  Was there any indication of who the loan was payable to?

A.  There was no indication of who the loan was payable to, or any documentation concerning the loan.  It just appeared.

TR. at 41.  She later reiterated, during re-direct, what she had known about the loans payable and any

loans or funds advanced by the Defendant to the Plaintiff:

Q.  Okay.  Do you know whether you've seen these exact balance sheets prior to the bankruptcy case, at any time prior to the bankruptcy case?

A.  I don't know that I received them prior to the bankruptcy case.

Q.  Okay.  The balance sheets that you had received that you testified to periodically during the period of 2001 to 2010, do you specifically recall whether a loan payable line item were on those balance sheets?

A.  I do not recall that at all until it was brought to my attention in 2009 by Mark Zuckerman, my CPA.

40

Q.  Okay.  At the time you received the balance sheets periodically during that period of 2001 to 2010, at the time you received them, did you have any reason in your mind to question whether the financial statements that were being provided to you were accurate at the time you received them?

A.  No.

Q.  Okay.  When is the first time you were informed of, or that you knew of loans being made by Mr. Gaudiano to Lingham Rawlings?

A.  Again, I, I didn't know about – are you referring to this loans payable?

Q.  No.  I'm just asking you, in general, from when you acquired the building through the bankruptcy date, when was the first time you became aware of any loans being made by Mr. Gaudiano to Lingham Rawlings?

A.  I couldn't, I mean, I had heard it mentioned, but I couldn't possibly tell you when.

Q.  Okay.  During the period 2001 through June of 2010, were you aware at some point that he had made a loan, or more than one loan to Lingham Rawlings?

A.  It was my understanding that because of the way Bridger set up their tenant improvement and capital improvement escrows, that if a tenant improvement needed to be made, that – and, and there was not enough money in the account at that time – Mr. Gaudiano would make sure that the improvement was made and then would be reimbursed by Bridger Commercial Funding once they had the documentation they required to release the funding.

TR. at 86-87.

Based upon the record and the testimony of Ms. Power and the Defendant, the court finds

the testimony of Ms. Power to be more credible with respect to what she had known and been made

aware of by the Defendant concerning the advances made into the Operating Account.  Both of the

parties testified that Ms. Power was not involved with the operations of the Shopping Center, was

not a signatory on the Operating Account, and left management of the building completely in the

hands of the Defendant.  Nevertheless, other than the time he testified to in 2006, when the Shopping

41

Center was required to undergo significant improvements, and he asked Ms. Power to obtain a loan to cover those costs, the Defendant did not advise her that monies were needed to infuse cash into the Operating Account. Each of the advances made by the Defendant were of his own volition and were neither discussed with nor authorized by the Plaintiff through Ms. Power, who testified that the Defendant never discussed this practice with her. Irrespective of the Defendant's argument to the contrary, i.e., that his practice of advancing funds and reimbursing himself from the Operating Account were his course of dealing with the Plaintiff, the fact is that this was not their course of dealing because Ms. Power did not know that it was happening. It is also irrelevant that the Defendant had engaged in this practice prior to owning the building because the ordinary course of business defense relates to the parties' dealings with each other. Furthermore, this practice clearly does not fall within the scope of industry norms. Again, it is the Defendant's course of dealing and how he operated as property manager, but his personal pattern of advancing funds at his sole discretion and without notice or authorization of the Plaintiff through Ms. Power is not determinative.

Furthermore, even if the practice were considered in the ordinary course of the parties' relationship, none of the previous reimbursements were for such a substantial amount as the June 7, 2010 transfer in the amount of $61,892.53. A review of the payments received by the Defendant and/or his companies from the period of March 13, 2001 through June 7, 2010, as reflected on Exhibit B to Mr. Costello's expert report entered into the record as Collective Trial Exhibit 21 and Late-Filed Trial Exhibit 44 prepared by the Defendant, evidences that of the majority of the transfers from the Operating Account to the Defendant were less than $10,000.00, the exceptions being a

$25,000.00 payment to Olympic Insurance Company in 2002, a $34,000.00 payment to Station West

in 2009, and the $61,892.53 payment on June 7, 2010. Based upon the nature of the parties'

relationship on June 7, 2010, and the circumstances surrounding the transfer – most notably the fact

that the Defendant's employment as manager was being terminated – whether any of the prior

transfers could be so considered, the final payment of $61,892.53 was not in the ordinary course of

business and would always have constituted a preferential transfer.

    In summary, the Plaintiff has satisfied the elements required under § 547(b) for a preferential

transfer, and the transfers that the Defendant made to himself between March 10 and June 8, 2010,

totaling $83,752.07, are avoidable as preferential transfers the Plaintiff is entitled to recover pursuant

to § 550(a)(1). The Defendant's oral motion to dismiss as to this cause of action will be denied.

### ii. Fraudulent Transfer

    The Plaintiff also seeks to avoid transfers that the Defendant made to himself pursuant to

11 U.S.C. § 548(a)(1) which provides, in material part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —
>
> . . .
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

43

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).  Under either subsection, the Plaintiff bears the burden of proof by a preponderance of the evidence.  *Shirley,* 2011 WL 4054773, at *3, 2011 Bankr. LEXIS 3496, at *9 (citations omitted).  Additionally, "to the extent that a transfer is avoided under section . . . 548 . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]"  11 U.S.C. § 550(a)(1).

During the two years preceding the June 8, 2010 bankruptcy filing, the Defendant received the following eighteen transfers totaling $148,937.00:  (1) check no. 2771 payable to Station West in the amount of $5,000.00 dated September 11, 2008; (2) check no. 2784 payable to Station West in the amount of $5,000.00 dated September 30, 2008; (3) check no. 2803 payable to Station West in the amount of $5,000.00 dated October 15, 2008; (4) check no. 2809 payable to Station West in the amount of $2,000.00 dated October 22, 2008; (5) check no. 2914 payable to Station West in the amount of $2,000.00 dated April 30, 2009; (6) check no. 2938 payable to LCUD for Station West in the amount of $2,274.78 dated May 22, 2009; (7) check no. 2973 payable to Miners in the amount

44

of $2,998.24 dated July 9, 2009; (8) check no. 2992 payable to Miners in the amount of $3,781.91

dated August 3, 2009; (9) check no. 3021 payable to Miners in the amount of $604.91 dated

September 8, 2009; (10) check no. 3053 payable to Station West in the amount of $34,000.00 dated

October 13, 2009; (11) check no. 3084 payable to Miners in the amount of $1,163.74 dated

November 9, 2009; (12) check no. 73141 payable to Miners in the amount of $701.21 dated

January 27, 2010; (13) check no. 3162 payable to Miners in the amount of $660.14 dated

February 22, 2010; (14) check no. 3172 payable to Station West in the amount of $10,000.00 dated

March 10, 2010; (15) check no. 3200 payable to Station West in the amount of $10,000.00 dated

April 12, 2010; (16) check no. 3202 payable to Miners in the amount of $1,209.46 dated April 12,

2010; (17) check no. 3242 payable to Miners in the amount of $650.08 dated May 20, 2010; and (18)

check no. 3262 payable to Station West in the amount of $61,892.53 dated June 7, 2010. *See* COLL.

TRIAL EX. 21 at Ex. B.


### a. Constructive Fraud - Bankruptcy Code


Section 548(a)(1)(B) carries no element of intent; instead, the sole issues are whether the

Plaintiff received less than reasonably equivalent value – determined by comparing the value of the

property transferred with the value of what the debtor received – in exchange for the transfers in

question and whether the Plaintiff was insolvent at the time of or rendered insolvent by the transfers

or whether the Defendant intended or believed that the Plaintiff would incur debts that would be

beyond its ability to pay as such debts matured. *See Shirley*, 2011 WL 4054773, at *8, *10, 2011

Bankr. LEXIS 3496, at *24, *30 (citations omitted).  The Bankruptcy Code does not, however,

define "reasonably equivalent value," so in order to ascertain whether there was, in fact, a reasonably

equivalent value exchanged, courts generally compare the value of the property transferred with the value of what the debtor received, considering the circumstances of each case; however, a dollar-for-dollar equivalent is not required. *Shirley,* 2011 WL 4054773, at *8, 2011 Bankr. LEXIS 3496, at *24 (citations omitted).  When determining whether reasonably equivalent value was exchanged, "the proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors.  As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred." *Shirley*, 2011 WL 4054773, at *10, 2011 Bankr. LEXIS 3496, at *31 (quoting *Congrove v. McDonald's Corp. (In re Congrove)*, 222 Fed. Appx. 450, 454, 2007 WL 130414, at *3, 2007 U.S. App. LEXIS 764, at *9-10 (6th Cir. Jan. 10, 2007) (internal citations omitted).  For the purposes of this subsection, the "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]"  11 U.S.C. § 548(d)(2)(A) (2006).

Unquestionably the Plaintiff received value in the form of the Defendant's management services.  At trial, Ms. Power testified that from 2001 through 2010, she was not involved in the day-to-day operations of the Shopping Center.  She was not a signatory on the bank account used by the Defendant to manage the Shopping Center, nor did she receive the bank statements.  She did not make leasing decisions, negotiate leases, communicate with tenants, or calculate the Defendant's management fee.  She did not consult with the Defendant about maintenance or authorize repairs of the Shopping Center.  Instead, Ms. Power testified that she relied entirely upon the Defendant to do all those things, that she was not concerned about the authority and control he was given under the

Management Agreement, and that over that period of time, she had very little communication with him. She also testified that from 2001 through 2010, she was provided with quarterly balance sheets from the Defendant as she requested them and that these documents were likewise provided to Mark Zuckerman, an accountant engaged by the Plaintiff, who then took the Defendant's balance sheets and financial information and prepared the Plaintiff's tax returns. Irrespective of the allegations raised in this adversary proceeding, the parties had entered into a binding Management Agreement under the terms of which the Defendant was entitled to compensation based upon 2% of the Shopping Center's total gross receipts.

Exhibit D to Mr. Costello's expert report, entered into evidence as Collective Trial Exhibit 21, is a document entitled "Summary of Rents Per Rent Rolls and Miscellaneous Receipts From Tenants" that provides the total rents received each year from May 2001 through June 2010. As reflected on this document, the Plaintiff received total rents of $350,964.00 in 2008, $334,794.00 in 2009, and $184,590.00 for January through June 2010, and total miscellaneous receipts of $15,864.00 in 2008, $0.00 in 2009, and $6,162.00 in 2010. However, because the individual rent roll and schedule of miscellaneous receipts are included within the record as part of Collective Trial Exhibit 11, the court will utilize the individual monthly totals to figure the Defendant's contractual compensation rather than utilizing the foregoing figures set forth in Exhibit D to Trial Exhibit 21. Based upon the rent rolls and statements of miscellaneous expenses, the court has summarized the Plaintiff's gross monthly receipts and the corresponding 2% management fee owed to the Defendant from June 2008 through June 2010 based on the monthly gross receipts:

|  | receipts received | 2% fee earned |
|---|---|---|
| June 2008 | $ 29,883.33 | $  597.67 |
| July 2008 | $ 29,888.33 | $  597.77 |
| August 2008 | $ 27,373.33 | $  547.47 |
| September 2008 | $ 28,163.33 | $  563.27 |
| October 2008 | $ 28,173.33 | $  563.47 |
| November 2008 | $ 31,373.33 | $  627.47 |
| December 2008 | $ 26,137.22 | $  522.74 |
| Totals for June – December 2008 | | |
| rents | $200,992.20 | $4,019.86 |
| miscellaneous | $   9,254.00[7] | $   317.28 |
| | $210,246.20 | $4,337.14 |
| | | |
| January 2009 | $ 26,927.03 | $  538.54 |
| February 2009 | $ 27,999.67 | $  559.99 |
| March 2009 | $ 27,394.33 | $  547.89 |
| April 2009 | $ 25,380.33 | $  507.61 |
| May 2009 | $ 26,952.82 | $  539.06 |
| June 2009 | $ 27,220.60 | $  544.41 |
| July 2009 | $ 28,753.33 | $  575.07 |
| August 2009 | $ 29,012.33 | $  580.25 |
| September 2009 | $ 30,223.33 | $  604.47 |
| October 2009 | $ 27,963.33 | $  559.27 |
| November 2009 | $ 27,993.33 | $  559.87 |
| December 2009 | $ 28,973.33 | $  579.47 |
| Totals for 2009 | | |
| rents | $334,793.76 | $4,019.86 |
| miscellaneous | $       0.00 | $      0.00 |
| | $334,793.76 | $6,695.90 |
| | | |
| January 2010 | | |
| rent | $ 31,653.33 | $  633.07 |
| February 2010 | | |
| rent | $ 30,643.64 | $  612.87 |
| miscellaneous | $     788.13 | $     15.76 |

---

[7] The ledgers for 2008 and 2009 do not include a statement of miscellaneous receipts and thus, the court has relied on those figures included within Mr. Costello's expert report to determine the 2% compensation due as to those receipts. With respect to 2010, however, the ledger includes a statement of miscellaneous receipts, and the court has used those monthly amounts rather than the annual figure included within Mr. Costello's expert report. Exhibit D to Mr. Costello's expert report reflects that the Plaintiff received a total of $15,864.00 in miscellaneous receipts for 2008. Because the court does not have a monthly breakdown, it has prorated for the seven months included within the look-back period.

| March 2010 | | |
|---|---|---|
| rent | $ 30,573.33 | $ 611.47 |
| miscellaneous | $ 791.64 | $ 15.83 |
| April 2010 | | |
| rent | $ 30,573.33 | $ 611.47 |
| miscellaneous | $ 408.95 | $ 8.18 |
| May 2010 | | |
| rent | $ 30,573.33 | $ 611.47 |
| miscellaneous | $ 644.10 | $ 12.88 |
| June 2010 | | |
| rent | $ 30,573.33 | $ 611.47 |
| miscellaneous | $ 2,412.00 | $ 48.24 |
| Totals for January – June 2010 | | |
| rent | $184,590.29 | $3,691.82 |
| miscellaneous | $ 5,044.82 | $ 100.89 |
| | | $3,792.71 |

*See* COLL. TRIAL EX. 11; COLL. TRIAL EX. 21 at Ex. D.  Accordingly, based upon the monthly rent

receipts and miscellaneous receipts received in 2008, 2009, and 2010, the Defendant was entitled

to total compensation of $4,337.14 for June through December 2008, $6,695.90 for 2009, and

$3,792.71 for January through June 2010, respectively.  Therefore, the aggregate amount of the

Defendant's compensation for which the Plaintiff received reasonably equivalent value is

$14,825.75.[8]  This amount shall be deducted from the $148,937.00 in total transfers that the

Defendant made to himself during the period of June 8, 2008 through June 8, 2010, leaving a balance

of $134,111.25 in potentially avoidable transfers under § 548(a)(1)(B).

This number can be further reduced by comparing the deposits made during the applicable

look-back period with the rent and miscellaneous receipts received by the Plaintiff during that same

period.  Under the Management Agreement, the Defendant was allowed to reimburse himself for

---

[8] Exhibit E to Mr. Costello's expert report reflects that the Defendant actually received $14,260.99 in payments attributed to his management fee.  Nevertheless, based upon the Management Agreement and the Plaintiff's actual receipts, the Defendant was entitled to receive the higher $14,825.75, and this is the figure that the court will use.

expenses that he incurred on the Plaintiff's behalf. *See* TRIAL EX. 5 at ¶ 4.1. At trial, the Defendant

testified that for years, he, through his various businesses, infused cash into the Plaintiff in order that

the Plaintiff could meet its obligations and that the monies he paid to himself in addition to his

management fee were reimbursements for those loans made to the Plaintiff beginning in 2001, and

continuing throughout the term of his management.[9] As reflected in the bank records for the

Operating Account, entered into the record as Collective Trial Exhibit 8, the following total deposits

were made for each of the following months compared to the receipts received by the Plaintiff, as

reflected in Collective Trial Exhibit 11:

| | total deposits | total receipts | difference |
|---|---|---|---|
| June 2008 | $47,169.28 | $29,883.33 | $ 17,285.95 |
| July 2008 | $24,176.69 | $29,888.33 | ($ 5,711.64) |
| August 2008 | $31,909.19 | $27,373.33 | $ 4,535.86 |
| September 2008 | $76,445.86 | $28,163.33 | $ 48,282.53 |
| October 2008 | $25,743.40 | $28,173.33 | ($ 2,429.93) |
| November 2008 | $29,273.44 | $31,373.33 | ($ 2,099.89) |
| December 2008 | $26,637.22 | $35,391.22[10] | ($ 8,754.00) |
| January 2009 | $35,747.03 | $26,927.03 | $ 8,820.00 |
| February 2009 | $24,299.67 | $27,999.67 | ($ 3,700.00) |
| March 2009 | $27,394.33 | $27,394.33 | $ 0.00 |
| April 2009 | $27,847.33 | $25,380.33 | $ 2,467.00 |
| May 2009 | $28,185.82 | $26,952.82 | $ 1,233.00 |
| June 2009 | $24,413.60 | $27,220.60 | ($ 2,807.00) |
| July 2009 | $45,283.66 | $28,753.33 | $ 16,530.33 |
| August 2009 | $21,394.33 | $29,012.33 | ($ 7,618.00) |
| September 2009 | $33,923.33 | $30,223.33 | $ 3,700.00 |

---

[9] During the applicable look-back period, the ending balance sheets prepared by the Defendant reflect "Loans Payable" in the amount of $104,653.55 as of December 31, 2008, $81,842.53 as of December 31, 2009, and $0.00 as of June 30, 2010. COLL. TRIAL EX. 12; COLL. TRIAL EX. 12A. On the other side, the Statement of Cash Flow for each of the foregoing years reflects that the Plaintiff made payments on its "Loans Payable" of $16,154.39 in 2008, negative $22,811.02 in 2009, and $81,842.53 in 2010. COLL. TRIAL EX. 12; COLL. TRIAL EX. 12A.

[10] Because the record does not contain a monthly miscellaneous expense ledger for 2008, this amount consists of the $26,137.22 rent receipts plus the $9,254.00 adjusted miscellaneous expenses for 2008 reflected in Mr. Costello's expert report. *See* COLL. TRIAL EX. 21 at Ex. D.

| | | |
|---|---|---|
| October 2009 | $27,963.33 | $27,963.33 | $        0.00 |
| November 2009 | $32,274.62 | $27,993.33 | $   4,281.29 |
| December 2009 | no deposit records | $28,973.33 | $        0.00[11] |
| January 2010 | $37,382.19 | $31,653.33 | $   5,728.86 |
| February 2010 | $32,777.84 | $31,431.77 | $   1,346.07 |
| March 2010 | $28,184.70 | $31,364.97 | ($ 3,180.27) |
| April 2010 | $32,763.91 | $30,982.28 | $   1,781.63 |
| May 2010 | $37,355.80 | $31,217.43 | $   6,138.37 |
| June 2010 | $31,088.40 | $32,985.33 | ($  1,896.93) |
| | | | $ 83,933.23 |

COLL. TRIAL EX. 8; COLL. TRIAL EX. 11; COLL. TRIAL EX. 21 at Ex. E. Based upon the record, the additional funds deposited into the Operating Account came from the Defendant and were used, at least to some degree, for the payment of the Plaintiff's obligations and benefit. Accordingly, this amount shall also be deducted from the $148,937.00 in total transfers that the Defendant made to himself during the period of June 8, 2008 through June 8, 2010, less the $14,825.75 previously deducted for the Defendant's management fee, leaving a balance of $50,178.02 in potentially avoidable transfers for which the court finds the Plaintiff did not receive reasonably equivalent value.[12]

The next issue is whether the Plaintiff was insolvent at the time of the transfers, if the transfers rendered the Plaintiff insolvent, or whether the Defendant intended or believed that the transfers would cause the Plaintiff to incur debts that were beyond the Plaintiff's ability to pay as they matured. The court has already determined that the Plaintiff was insolvent on or before ninety days preceding its bankruptcy filing. Accordingly, any transfers made within that time – i.e., the

---

[11] Because the record does not reflect otherwise and since the bank records do not include deposits for December 2009, the court will consider that month to have equaled out.

[12] This figure is also in line with the determination by Mr. Costello that "the excess of withdrawals over deposits may be as high as $50,132.00." COLL. TRIAL EX. 21 at 7.

transfers that the Defendant made between March 10 and June 8, 2010, totaling $83,752.07 – would

likewise fall within the scope of § 548(a)(1).   Based upon the record, the court additionally finds

that the Defendant believed that the Plaintiff had incurred debts beyond its ability to pay, i.e., its

mortgage obligation, during the two-year look-back period.   By his own admission and as reflected

in the record, the Defendant infused cash into the Plaintiff on numerous occasions during this time.

According to his own testimony, had the Defendant not deposited funds from his entities, the

Plaintiff would have at times been unable to meet its mortgage obligation.   By that same token, by

making the transfers totaling $50,178.02 for which the court has determined the Plaintiff did not

receive reasonably equivalent value, the Defendant logically would have known that the Plaintiff had

incurred debts that were beyond its ability to pay.   Accordingly, the court finds that the entire

$50,178.02 for which the Plaintiff did not receive reasonably equivalent value was a fraudulent

transfer pursuant to § 548(a)(1)(B).

Notwithstanding the above finding, because the five transfers made between March 10, 2010,

and June 7, 2010, totaling $83,757.02, have already been determined to be avoidable as preferences

under § 547(b), the court will not provide the Debtor a windfall by double counting them, i.e., will

not also include them as transfers for purposes of § 548(a)(1)(B).   Accordingly, since these transfers

exceed the remaining $50,178.02 in partially avoidable transfers under § 548(a)(1)(B), the court

cannot find that the Plaintiff is entitled to a judgment on the § 548(a)(1)(B) issue.   The Defendant's

oral motion to dismiss will, therefore, be granted.

## b.  Constructive Fraud - Tennessee law

As a basis for setting aside the transfers that the Defendant made to himself between June 8, 2008 and June 8, 2010, the Plaintiff also relies upon 11 U.S.C. § 544(b), which provides that:

> (b)(1) Except as provided in paragraph (2) [concerning transfers of charitable contributions], the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b).  Section § 544(b) permits the Plaintiff to "'stand in the shoes' of an unsecured creditor and assert causes of action under state fraudulent conveyance laws for the benefit of all creditors." *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007) (citations omitted).  As evidenced by the plain language of the statute, "§ 544(b) contains four requirements: (1) [a] creditor, (2) holding an allowable unsecured claim; and (3) a transfer of an interest of the debtor in property, (4) that is voidable under applicable [state] law." *Forbes*, 372 B.R. at 330 (quoting *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 100 (B.A.P. 6th Cir. 1997)).  In conjunction with § 544(b), the Plaintiff cites to Tennessee Code Annotated § 66-3-305 for transfers deemed fraudulent as to present and future creditors and § 66-3-306(a) relating to transfers deemed fraudulent as to present creditors.

Tennessee Code Annotated § 66-3-305(a) provides in material part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>     . . . .

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TENN. CODE ANN. § 66-3-305. "A cause of action with respect to a fraudulent transfer or obligation under [§ 66-3-305(a)(1)] is extinguished unless action is brought: . . . within four (4) years after the transfer was made or the obligation was incurred . . . [.]" TENN. CODE ANN. § 66-3-310(1) (2004).

Similarly, Tennessee Code Annotated § 66-3-306(a) states that:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TENN. CODE ANN. § 66-3-306(a). This statute also requires that a cause of action be brought "within four (4) years after the transfer was made or the obligation was incurred[.]" TENN. CODE ANN. § 66-3-310(2) (2004).

> "Whether a transfer is fraudulent is determined by the facts and circumstances of each case[,]" *Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986). The requirements of these constructive fraud statutes have been succinctly summarized as follows:

> > Reading the two constructive fraud statutes together, they require proof that:

> > > The debtor did not receive reasonably equivalent value in exchange for the transfer; *and*

(1) the debtor was engaged in or about to engage in business or transaction for which [its] remaining assets were unreasonably small in relation to the business or transaction; *or*

(2) the debtor intended to incur, or believed or reasonably should have believed that [it] would incur debts beyond [its] ability to pay as they became due; *or*

(3) the debtor was insolvent at the time of the transfer or was rendered insolvent by the transfer.

*Farinash v. Silvey (In re Silvey)*, 378 B.R. 186, 190-91 (Bankr. E.D. Tenn. 2007) (citations omitted).

*Webb Mtn., LLC*, 420 B.R. at 431.  As under the Bankruptcy Code, the Plaintiff bears the burden of proving each element of both statutes by a preponderance of the evidence.  *Forbes*, 372 B.R. at 330.

Having referred to the Tennessee statutes relied upon by the Plaintiff in support of its claim under § 544(b)(1), the court need not proceed further because the Plaintiff cannot prevail on this issue.  As noted, the Plaintiff's ability to proceed under this section is conditioned upon the existence of an unsecured creditor holding an allowable unsecured claim who may avoid the disputed transfer under applicable non-bankruptcy law.  Here, no such creditor exists.

In the Summary of Schedules, Schedule E - Creditors Holding Unsecured Priority Claims and Schedule F - Creditors Holding Unsecured Nonpriority Claims filed by the Plaintiff in conjunction with its bankruptcy case, the Plaintiff lists "None" or "0.00" in unsecured claims.[13]  *See* TRIAL EX. 2. Additionally, the Plaintiff's Modified Amended Plan of Reorganization of Lingham Rawlings, LLC confirmed on July 6, 2011, provides at Article II for three classes:  Class 1 consists of the secured

---

[13] Schedule F does list three unsecured creditors:  Knoxville Utilities Board, the Plaintiff, and Waste Connections.  The amount of each claim is listed as "Unknown" and the total amount of such claims is listed as "0.00."

claim of the First Lien Lender, Class 2 consists of the secured claim of the Second Lien Lender, and

Class 3 consists of the Equity Interests in the Plaintiff.  *See* TRIAL EX. 4.  The plan does not provide

for payment to a class of unsecured creditors because there are none.  The court also takes judicial

notice under Rule 201 of the Federal Rules of Evidence that no unsecured creditor filed a proof of

claim during the pendency of the Plaintiff's Chapter 11 case.[14]  Finally, the Plaintiff offered no proof

of the existence of an unsecured creditor on the date of the transfers.  *See Bumgardner v. Sun Bank*

*(In re Simco Mechanical, Inc.)*, 151 B.R. 978, 983 (Bankr. S.D. Fla. 1993) ("[T]he Plaintiff must

establish that at the time of the transfers there was in fact a creditor in existence holding a valid claim

against the Debtor who could have avoided the transfer in question under applicable nonbankruptcy

law."); *In re Turner*, 78 B.R. 166, 170 (Bankr. E.D. Tenn. 1987) ("[T]here [must be] proof of an

actual existing creditor who could avoid the [transfer]." ).

Because the Plaintiff has not established the existence of a creditor "holding an unsecured

claim that is allowable under section 502," it cannot prevail under § 544(b)(1).  The Defendant's oral

motion to dismiss will be granted on this issue.

### iii.  Fraudulent Concealment

The Plaintiff contends that the Defendant fraudulently concealed not only the difficulties that

the Shopping Center was having making the mortgage payments but also the mortgage default, that

Ms. Power did not learn of the default until notified by the lender, and that this default ultimately

led to the Plaintiff's bankruptcy case after negotiations to restructure and resolve the mortgage

---

[14] Citizens National Bank filed a secured claim in the amount of $195,958.74.  No other claims were filed.

obligation failed.  "The tort of fraudulent concealment is committed when a party who has a duty to

disclose a known fact or condition fails to do so, and another party reasonably relies upon the

resulting misrepresentation, thereby suffering injury."  *Chrisman v. Hill Home Dev., Inc.*, 978

S.W.2d 535, 538-39 (Tenn. 1998).  "To establish fraudulent concealment, a plaintiff must prove

(1) that the defendant took affirmative action to conceal the cause of action or remained silent and

failed to disclose material facts despite a duty to do so and, (2) the plaintiff could not have

discovered the cause of action despite exercising reasonable care and diligence."  *Shadrick v. Coker*,

963 S.W.2d 726, 735 (Tenn. 1998) (internal citations omitted).

> For the nondisclosure to constitute fraud, the charged party must have knowledge of
> an existing fact or condition and a duty to disclose that fact or condition.  The fact or
> condition must be a material fact.  Quoting the Restatement (Second) of Torts
> Section 538, we have opined that a fact is material if:  (a) a reasonable [person]
> would attach importance to its existence or nonexistence in determining his [or her]
> choice of action in the transaction in question; or (b) the maker of the representation
> knows or has reason to know that its recipient regards or is likely to regard the matter
> as important in determining his [or her] choice of action, although a reasonable
> [person] would not so regard it.  Although there may be a duty to disclose material
> facts, a party does not have a duty to disclose a material fact where ordinary diligence
> would have revealed the undisclosed fact.  A party cannot be permitted to claim that
> he has been taken advantage of if he had the means of acquiring the needed
> information or if, because of his business experience or his prior dealings with the
> other party, he should have acquired further information before he acted.  In addition,
> a plaintiff's damages must have been caused by his reasonable reliance on the
> nondisclosure, i.e., the plaintiff was not aware of the material fact and would have
> acted differently if the plaintiff knew of the concealed or suppressed fact.  A plaintiff
> is not required to demonstrate an "intent to deceive" to establish a claim for
> fraudulent concealment.

*PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387

S.W.3d 525, 550-51 (Tenn. Ct. App. 2012) (citations and quotation marks omitted).

In opposition, the Defendant argues that he regularly provided financial statements to Ms. Power, who never questioned them and never requested any sort of audit from the Defendant. He also argues that even after Ms. Power learned of the mortgage default, the Plaintiff continued to engage the Defendant as the Shopping Center's manager, included him in the negotiations to cure the default, and directed him to make payments totaling $40,000.00 to the lender during the attempts to renegotiate.  The Defendant has further argued that the Plaintiff cannot prevail on this cause of action because torts cannot be predicated upon breach of contract, to which the Plaintiff has countered that the Defendant owed a fiduciary duty to the Plaintiff – which he has acknowledged in the Defendant's Pretrial Brief filed on July 24, 2012 –  and his fraudulent concealment breached that fiduciary duty.

Although the Defendant owed a fiduciary duty to the Plaintiff under the Management Contract, which will be specifically addressed in subsection v., *infra*, the parties' relationship existed entirely due to the Management Agreement, which imposed upon the Defendant an obligation to, *inter alia*, establish an operating account, collect money from tenants, pay all operating expenses, and provide the Plaintiff with financial reports.  *See* TRIAL EX. 5 at ¶¶ 1.1, 2.1, 3.1, 4.1, 6.  The Management Agreement does not require the Defendant to otherwise notify the Plaintiff if or when the Shopping Center's cash flow decreased, although the record reflects that Ms. Power was approached by the Defendant on at least one occasion about trying to reduce the escrow demands made by Bridger Commercial Funding.  Additionally, Ms. Power was provided with annual financial statements prepared by the Defendant consisting of Balance Sheets, Income Statements, Statements of Cash Flow, Rent Rolls, and ledgers, which reflected, among other things, minimal or negative

cash provided by operations and increasing loans payable balances. *See* COLL. TRIAL EX. 11.  She never, however, discussed the Shopping Center's financial condition with the Defendant or questioned the financial statements she was provided.  Had she made inquiries, the Defendant would have alerted her to the potential default, and Ms. Power could have then taken action she deemed appropriate.  The Plaintiff's failure to follow up precludes her ability to now assert that the Defendant acted fraudulently by not disclosing the Shopping Center's financial condition.  *See PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship*, 387 S.W.3d at 550-51 ("Although there may be a duty to disclose material facts, a party does not have a duty to disclose a material fact where ordinary diligence would have revealed the undisclosed fact.  A party cannot be permitted to claim that he has been taken advantage of if he had the means of acquiring the needed information or if, because of his business experience or his prior dealings with the other party, he should have acquired further information before he acted.").  The Defendant's oral motion to dismiss shall be granted and the Complaint shall be dismissed with respect to this cause of action.

### iv.  Professional Negligence

Next, the Plaintiff argues that the Defendant's actions constitute a breach of duty evidencing professional negligence.  The elements of negligence are "(1) duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; (5) proximate, or legal cause." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008).

> Duty of care is defined as "the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for protection against unreasonable risks of harm." *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 894 (Tenn.

> 1996).  Assuming that a duty is owed to the plaintiff, the defendant breaches that duty when he and she fails to exercise reasonable care under the circumstances.  *McCall v. Wilder*, 913 S.W.2d 150, 153-54 (Tenn. 1995).  Reasonable care "is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury."  *Doe v. Linder Constr. Co., Inc.*, 845 S.W.2d 173, 178 (Tenn. 1992).

*Ferguson v. Nationwide Prop. & Cas. Ins. Co.*, 218 S.W.3d 42, 58 (Tenn. Ct. App. 2006).  Finally, proximate cause requires proof that the defendant's conduct was a "substantial factor in bringing about the harm complained of[,]" that because of the manner in which the plaintiff was harmed, "no rule or policy . . . should relieve the wrongdoer from liability[,]" and "a person of ordinary intelligence and prudence" could have reasonably foreseen the complained of harm.  *Moore v. Houston County Bd. of Educ.*, 358 S.W.3d 612, 619 (Tenn. Ct. App. 2011) (citations omitted).

Tennessee courts recognize that "[p]rofessionals are judged according to the standard of care required by their profession[,]" *Dooley v. Everett*, 805 S.W.2d 380, 384-85 (Tenn. Ct. App. 1990), and have adopted, with respect to professional negligence, the "same or similar community" standard of care that "'[u]nless he represents that he has a greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.'"  *Martin v. Barge, Waggoner, Sumner & Cannon*, 894 S.W.2d 750, 751 (Tenn. Ct. App. 1994) (quoting RESTATEMENT OF TORTS (SECOND) § 299A (1965)).

> The standard of care applicable to the conduct of . . . accountants is the same as that applied to doctors, lawyers, architects, engineers and others furnishing skilled services for compensation and that standard requires reasonable care and competence therein.  Accountants [and other professionals] owe a legal duty to their employer to make reports without fraud and a contractual duty to make them under the terms of the contract with care and caution required by the standards of their profession.

*Delmar Vineyard v. Timmons*, 486 S.W.2d 914, 920 (Tenn. Ct. App. 1972).  With respect to injury,

> [t]he plaintiff's knowledge of his injury may be established by actual or constructive knowledge.  Actual knowledge . . . may be found, for example, when the plaintiff is informed by another . . . that malpractice has occurred.  Constructive knowledge may be found, however, where the plaintiff reasonably is aware of facts that reasonably should put him on notice that he has been injured as a result of the defendant's conduct.  It is not necessary that the plaintiff know that the defendant's conduct was, in fact, below the standard of care, and the plaintiff may not delay the filing of a suit until all the consequences of the alleged malpractice are actually known.  Thus, the plaintiff must be aware of facts which reasonably put him on notice that he has suffered an injury and that the injury resulted from the alleged professional negligence.

*Wilson v. Pickens*, 196 S.W.3d 138, 142 (Tenn. Ct. App. 2005) (citations omitted).

In support of this cause of action, the Plaintiff contends that the Defendant was negligent in his professional duties by commingling the Plaintiff's funds with funds belonging to entities he controlled, by paying himself amounts exceeding what he was owed from the Plaintiff's Operating Account, by failing to maintain proper accounting and financial records for the Shopping Center, by failing to keep proper records, invoices, and receipts to support his expenditures for supplies, maintenance, and repairs, and by spending in excess for supplies, maintenance, and repairs than was reasonable.  In support, the Plaintiff relies in large part upon Mr. Costello's expert report[15] within which Mr. Costello makes the following assessments that he opines are consistent with professional negligence:

> Salvador Gaudiano, individually and operating as his sole proprietorship Briarcliff Management Company (collectively Gaudiano), operated the Property at purported expense levels for property maintenance and repairs materially in excess of industry norms for comparable commercial property.

---

[15] Mr. Costello attached as Appendix 1 to his expert report a list, consisting of twenty-seven items, that he reviewed in making his determinations and preparing his report.  Among those items reviewed were a number of documents that were not exhibits at trial and are, therefore, not a part of the record before the court.

. . . .

Gaudiano operated the Property at purported non-utility expense levels materially in excess of the level of non-utility expenses incurred by the Property's current management during the period July 1, 2010 through June 30, 2011 (the Post-Bankruptcy Period).

. . . .

Gaudiano comingled [sic] his personal funds and the funds of other entities controlled by him with the operating funds of Lingham Rawlings.

. . . .

Based upon my review of the available financial records for the Property during the Gaudiano Management Period, Gaudiano's withdrawals from certain escrow accounts maintained by or on behalf of Lingham Rawlings's secured lenders for tenant improvements (the Tenant Improvement Escrow) during the Gaudiano Management Period exceeded the available documentation evidencing the necessity for such withdrawals by approximately $139,300.

. . . .

Based upon my experience it is my expert opinion that, during the Gaudiano Management Period, Gaudiano did not maintain accounting and financial records with respect to the Property consistent with what would be expected of an experienced property or business manager.

COLL. TRIAL EX. 21 at 1-3.

As previously stated, the parties' relationship arose entirely out of the Management Agreement which appointed the Defendant as the Plaintiff's "sole and exclusive Agent of Owner to lease and manage" the Shopping Center. TRIAL EX. 5 at ¶ 1.1. Accordingly, the professional standard by which the Defendant was held was that of agent in his role as manager of the Shopping Center. That said, under Tennessee law, it appears that causes of action for professional negligence are reserved for those professions requiring a license – such as physicians, attorneys, accountants,

real estate agents and brokers – and individuals who have represented to the public that they possess knowledge and skills apart from others.  In this case, the Defendant managed the Shopping Center property from 1995 through June 2010, but he does not hold any licenses and has not held himself out as being any sort of expert in the field of management.  Although he was, at one time, a certified public accountant, he does not possess that license in Tennessee and did not act as an accountant for the Plaintiff.

Furthermore, under Tennessee law, "[i]t is well settled that a tort cannot be predicated on a breach of contract.  A tort exists only if a party breaches a duty which he owes to another independently of the contract."  *Calipari v. Powertel, Inc.*, 231 F. Supp. 2d 734, 736 (W.D. Tenn. 2002); *see also Palmer v. Nationwide Mut. Ins. Co.*, 945 F.2d 1371, 1375 (6th Cir. 1991).

> Tort law, including the law of negligence, is designed to protect all persons generally from the risk of physical or, in some cases, emotional harm to their persons or property.  Tort obligations are, in general, obligations imposed by law, without any necessity of a consensual undertaking between the parties.  The socially-imposed obligation to use care, commonly referred to as "duty," is usually considered owed to all those within range of harm, without regard to whether those persons have a contract with the actor.

> Contract duties are obligations of a different nature with a smaller scope.  Party-specific, they arise out of "the manifested intention of the parties to a bargaining transaction."  W. Page Keeton, Prosser and Keeton on the law of Torts § 92, at 656 (5th ed.1984).  Any breach of them, whether wilful or careless, is a breach of duties that the parties have fixed for themselves.

> If a duty to conform to a standard exists between the parties irrespective of contract, and the defendant is negligent, the damaged plaintiff, generally speaking, may sue in tort.  However, if the only source of duty between a particular plaintiff and defendant is their contract with each other, then a breach of that duty, without more, ordinarily will not support a negligence action.

> Ordinarily, it is not a tort for one of the contracting parties to breach the contract.  Conduct constituting breach of contract becomes tortious only when it also violates

a duty, independent of the contract, arising from wider principles of social responsibility. Short of that, a party's breach of contract remains enforceable as a contract action - not as a tort action - regardless of whether the breach was an intentional one or an unintentional one caused by carelessness.

*Thomas & Assocs., Inc. v. Metro. Gov't of Nashville & Davidson County*, 2003 WL 21302974, at *6, 2003 Tenn. App. LEXIS 425, at *17-*19 (Tenn. Ct. App. June 6, 2003) (citations omitted). Because "[a] contract may be negligently or fraudulently breached and the cause of action remain [sic] in contract rather than in tort[,]" *Mid-South Milling Co. v. Loret Farms, Inc.*, 521 S.W.2d 586, 588 (Tenn. 1975), "[r]egardless of whether a party's actions were intentional or negligent, if they were in an attempted performance of a contract, the action will remain in contract." *Fifth Third Leasing Co. v. Cherokee Pontiac, Buick, Olds, GMC Trucks, LLC*, 2002 WL 407224, at *2, 2002 Tenn. App. LEXIS 184, at *6 (Tenn. Ct. App. Mar. 13, 2002). "Insofar as a breach of contract action is concerned, it matters not whether the breach was intentionally or unintentionally caused by negligence in attempting performance, the action remains in contract." *Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992).

The Plaintiff's cause of action for professional negligence is based entirely upon a duty created by contract. Accordingly, the Defendant's oral motion to dismiss will be granted and the Complaint will be dismissed as to the Plaintiff's averments of professional negligence.

### v. Breach of Fiduciary Duty

The Plaintiff next contends that the Defendant breached the fiduciary duty that he owed to the Plaintiff as manager of the Shopping Center by paying himself management fees in excess of what he was owed under the Management Agreement, by commingling funds belonging to the

Shopping Center with funds belonging to himself and/or his various entities, by reimbursing himself

for expenses in excess of what is reasonable, by failing to maintain proper financial records of

expenditures paid from the Operating Account, and by not disclosing to the Plaintiff relevant

information including that the Shopping Center's mortgage obligation was in default.  In Tennessee,

"[a]gency is a fiduciary relationship that arises when the principal manifests assent to the agent that

the agent shall act on the principal's behalf[,]" *Morrison v. Allen*, 338 S.W.3d 417, 450 (Tenn.

2011), and "[a]n agent is a fiduciary with respect to the matters within the scope of his agency."

*Knox-Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 36 (Tenn. 1988).

> A fiduciary or confidential relationship can exist without an express or implied contract.  The relationship arises when one person reposes special trust and confidence in another person and that other person – the fiduciary – undertakes to assume responsibility for the affairs of the other party.  The person upon whom the trust and confidence is imposed is under a duty to act for and to give advice for the benefit of the other person on matters within the scope of the relationship.  Fiduciary duties are the highest standard of duty imposed by law.

*Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626, 641-42 (Tenn. 2008) (citations

omitted).

> In Tennessee, the relation of principal and agent is a trust relation.  *Judds v. Pritchard*, 1997 WL 589070, at *5, 1997 Tenn. Ct. App. LEXIS 647, at *15 (Tenn. Ct. App. Sept. 24, 1997) (citing *McNeil v. Dobson-Bainbridge Realty Co.*, 195 S.W.2d 626, 629 (Tenn. 1946)).  An agent is simply "[o]ne who undertakes to transact some business, or to manage some affair, for another, by the authority and on account for the latter, and to render an account of it." *Id.* (citing *Sec. Fed. Sav. & Loan Ass'n of Nashville v. Riviera, Ltd.*, 856 S.W.2d 709, 715 (Tenn. Ct. App. 1992) (quoting *Miller v. Ins. Co. of N. Am.*, 366 S.W.2d 909, 911 (Tenn. 1963)).  "Whether an agency has been created is to be determined by the relations of the parties as they in fact exist under their agreements or acts.  If relations exist which will constitute agency, it will be an agency, whether the parties understood it to be or not." *Id.* (quoting *Kerney v. Aetna Cas. & Surety Co.*, 648 S.W.2d 247, 252-53 (Tenn. Ct. App. 1982)).

*Cagle v. Hybner*, 2008 WL 2649643, at *7, 2008 Tenn. Ct. App. LEXIS 389, at *19-20 (Tenn. Ct.

App. July 3, 2008).  "The fiduciary nature of the agent's obligations requires the agent to act loyally

in the principal's interest, as well as on the principal's behalf[, although a]n agent's fiduciary duties

to his or her principal vary depending on the parties' agreement and the scope of their relationship."

*Morrison*, 338 S.W.3d at 450 (citations omitted).  Additionally, "a party is liable for non-disclosure

of a material fact only where there is a duty to disclose the facts at issue[,]" i.e., when "there is a

definite fiduciary relation between the parties[,] . . . it appears one or each of the parties to the

contract expressly reposes a trust and confidence in the other[, and] . . . the contract or transaction

is intrinsically fiduciary and calls for perfect good faith."  *French v. First Union Sec., Inc.*, 209 F.

Supp. 2d 818, 824-25 (M.D. Tenn. 2002) (internal brackets omitted) (quoting *Macon Cnty. Livestock*

*Mkt., Inc. v. Ky. State Bank, Inc.*, 724 S.W.2d 343, 349 (Tenn. Ct. App. 1986)).  Additionally

"[p]roof of damages is an essential element of a fiduciary duty claim, as is causation of damages."

*Morrison*, 338 S.W.3d at 438 (internal citation and quotation marks omitted).

There is no dispute that the Defendant, in his capacity as the manager for the Shopping

Center, owed a fiduciary duty to the Plaintiff within the scope of that relationship.  Under the

Management Agreement, the Defendant, doing business as Briarcliff Management, was appointed

as "sole and exclusive Agent of Owner to lease and manage the [Shopping Center]" and  agreed "to

furnish the services of its organization for the leasing and management of the [Shopping Center]."

TRIAL EX. 5 at ¶ 1.1.  Further, the Management Agreement expressly states that "[t]he relationship

of the parties to this Agreement shall be that of Principal and Agent, and all duties to be performed

by Agent under this Agreement shall be for and on behalf of Owner, in Owner's name, and for

Owner's account[,]" TRIAL EX. 5 at ¶ 11, a relationship that the Defendant acknowledged in his pretrial brief, stating that "[a]s a fiduciary to Plaintiff, [he] owed a duty to be careful, skillful, diligent and loyal in the performance of Plaintiff's business." DEF.'S PRETRIAL BRIEF at 8. In his deposition, the Defendant testified that his duties in managing the property were "[b]asically, the accounting work; collect the rents, pay the bills . . . [and making debt service payments a]s part of the bills." TRIAL EX. 20 at 30, lines 15-22. Furthermore, the Plaintiff testified that she relinquished control over the Shopping Center to the Defendant and completely relied upon him to manage it.

The Plaintiff argues that, between March 2001 and June 2010, the Defendant paid himself in excess of the management fee he was owed under the Management Agreement. As previously discussed, the Defendant was owed compensation of "2% of the total monthly gross receipts from the [Shopping Center], payable by the 5th day of the month[.]" TRIAL EX. 5. Collective Trial Exhibit 11 includes the rent rolls for each year broken down by month, and Exhibit D to Mr. Costello's expert report provides a summary of the miscellaneous receipts received by the Plaintiff during the time in question. Based upon these figures, the following represents the gross monthly receipts for the Shopping Center, a corresponding 2% management fee based upon those gross monthly receipts, the amount that the Defendant paid himself as reflected in Exhibit E to Mr. Costello's expert report, and the difference between what was earned and what was paid as follows:[16]

---

[16] With the exception of 2010, none of the ledgers include a statement of miscellaneous receipts and thus, the court has relied on the figures included within Mr. Costello's expert report to determine the 2% compensation due as to those receipts. With respect to 2010, however, because the ledger includes a statement of miscellaneous receipts, the court has used those monthly amounts rather than the annual figure included within Mr. Costello's expert report.

| | receipts received | 2% fee earned | paid to Defendant | difference |
|---|---|---|---|---|
| February 2001 | $  1,123.69 | $    22.47 | $     0.00 | ($   22.47) |
| March 2001 | $ 31,463.33 | $   629.27 | $   629.27 | $    0.00 |
| April 2001 | $ 31,463.00 | $   629.26 | $   692.42 | $   63.16 |
| May 2001 | $ 31,463.00 | $   629.26 | $   686.24 | $   56.98 |
| June 2001 | $ 30,701.00 | $   614.02 | $   670.33 | $   56.31 |
| July 2001 | $ 30,701.00 | $   614.02 | $   679.96 | $   65.94 |
| August 2001 | $ 30,701.00 | $   614.02 | $   686.75 | $   72.73 |
| September 2001 | $ 30,701.00 | $   614.02 | $   688.78 | $   74.76 |
| October 2001 | $ 30,701.00 | $   614.02 | $   691.50 | $   77.48 |
| November 2001 | $ 29,615.66 | $   592.31 | $   678.23 | $   85.92 |
| December 2001 | $ 29,615.66 | $   592.31 | $   649.43 | $   57.12 |
| Totals for 2001 | | | | |
| rents | $308,249.34 | $6,164.98 | | |
| miscellaneous | $  12,187.00 | $   243.74 | | ($   243.74) |
| | $320,436.34 | $6,408.72 | $6,752.91 | $   344.19 |
| | | | | |
| January 2002 | $ 29,615.66 | $   592.31 | $   773.60 | $ 181.29 |
| February 2002 | $ 27,647.00 | $   552.94 | $   691.56 | $ 138.62 |
| March 2002 | $ 27,381.67 | $   547.63 | $   618.14 | $   70.51 |
| April 2002 | $ 27,381.67 | $   547.63 | $   619.30 | $   71.67 |
| May 2002 | $ 27,381.67 | $   547.63 | $   619.50 | $   71.87 |
| June 2002 | $ 27,381.67 | $   547.63 | $   627.32 | $   79.69 |
| July 2002 | $ 27,381.67 | $   547.63 | $   630.95 | $   83.32 |
| August 2002 | $ 28,506.67 | $   570.13 | $   651.67 | $   81.54 |
| September 2002 | $ 28,231.67 | $   564.63 | $   652.63 | $   88.00 |
| October 2002 | $ 28,631.67 | $   572.63 | $   659.83 | $   87.20 |
| November 2002 | $ 28,631.67 | $   572.63 | $   671.74 | $   99.11 |
| December 2002 | $ 28,631.67 | $   572.63 | $   631.97 | $   59.34 |
| Totals for 2002 | | | | |
| rents | $336,804.36 | $ 6,736.05 | | |
| miscellaneous | $  21,846.00 | $   436.92 | | ($436.92) |
| | $  53,810.66 | $7,172.97 | $ 7,848.21 | $  675.24 |
| | | | | |
| January 2003 | $ 29,131.67 | $   582.63 | $   780.24 | $ 197.61 |
| February 2003 | $ 29,711.67 | $   594.23 | $   671.41 | $   77.18 |
| March 2003 | $ 27,551.67 | $   551.03 | $   628.65 | $   77.62 |
| April 2003 | $ 24,965.00 | $   499.30 | $   553.02 | $   53.72 |
| May 2003 | $ 28,630.00 | $   572.60 | $   631.22 | $   58.62 |
| June 2003 | $ 28,630.00 | $   572.60 | $   628.94 | $   56.34 |
| July 2003 | $ 28,630.00 | $   572.60 | $   640.90 | $   68.30 |
| August 2003 | $ 29,130.00 | $   582.60 | $   660.12 | $   77.52 |

| | | | |
|---|---|---|---|
| September 2003 | $ 28,630.33 | $ 572.61 | $ 644.42 | $ 71.81 |
| October 2003 | $ 28,630.33 | $ 572.61 | $ 641.90 | $ 69.29 |
| November 2003 | $ 28,630.33 | $ 572.61 | $ 646.14 | $ 73.53 |
| December 2003 | $ 28,630.33 | $ 572.61 | $ 631.07 | $ 58.56 |
| Totals for 2003 | | | | |
| rents | $340,901.33 | $6,818.03 | | |
| miscellaneous | $ 13,440.00 | $ 268.80 | | ($ 268.80) |
| | $354,341.33 | $7,086.83 | $7,758.03 | $ 671.20 |
| | | | | |
| January 2004 | $ 28,630.33 | $ 572.61 | $ 800.03 | $ 227.42 |
| February 2004 | $ 28,630.33 | $ 572.61 | $ 661.29 | $ 88.68 |
| March 2004 | $ 28,630.33 | $ 572.61 | $ 654.01 | $ 81.40 |
| April 2004 | $ 28,630.33 | $ 572.61 | $ 641.71 | $ 69.10 |
| May 2004 | $ 28,630.33 | $ 572.61 | $ 643.18 | $ 70.57 |
| June 2004 | $ 28,630.33 | $ 572.61 | $ 645.87 | $ 73.26 |
| July 2004 | $ 28,630.33 | $ 572.61 | $ 666.15 | $ 93.54 |
| August 2004 | $ 28,630.33 | $ 572.61 | $ 663.84 | $ 91.23 |
| September 2004 | $ 28,630.33 | $ 572.61 | $ 656.59 | $ 83.98 |
| October 2004 | $ 28,630.33 | $ 572.61 | $ 658.23 | $ 85.62 |
| November 2004 | $ 29,880.33 | $ 597.61 | $ 855.27 | $ 257.66 |
| December 2004 | $ 30,130.33 | $ 602.61 | $ 668.38 | $ 65.77 |
| Totals for 2004 | | | | |
| rents | $346,313.96 | $6,926.32 | | |
| miscellaneous | $ 42,252.00 | $ 845.04 | | ($ 845.04) |
| | $388,565.96 | $7,771.36 | $8,214.55 | $ 443.19 |
| | | | | |
| January 2005 | $ 26,999.33 | $ 539.99 | $ 614.21 | $ 74.22 |
| February 2005 | $ 26,999.33 | $ 569.99 | $ 616.36 | $ 76.37 |
| March 2005 | $ 27,299.33 | $ 545.99 | $ 615.60 | $ 69.61 |
| April 2005 | $ 27,299.33 | $ 545.99 | $ 607.95 | $ 61.96 |
| May 2005 | $ 27,299.33 | $ 545.99 | $ 602.33 | $ 56.34 |
| June 2005 | $ 26,999.33 | $ 539.99 | $ 603.54 | $ 63.55 |
| July 2005 | $ 26,999.33 | $ 539.99 | $ 604.32 | $ 64.33 |
| August 2005 | $ 26,999.33 | $ 539.99 | $ 612.83 | $ 72.84 |
| September 2005 | $ 27,949.33 | $ 558.99 | $ 630.93 | $ 71.94 |
| October 2005 | $ 27,949.33 | $ 558.99 | $ 842.14 | $ 283.15 |
| November 2005 | $ 27,984.33 | $ 559.69 | $ 629.68 | $ 69.99 |
| December 2005 | $ 27,984.33 | $ 559.69 | $ 619.50 | $ 59.81 |
| Totals for 2005 | | | | |
| rents | $328,761.96 | $6,575.28 | | |
| miscellaneous | $ 17,466.00 | $ 349.32 | | ($ 349.32) |
| | $346,227.96 | $6,924.60 | $7,599.39 | $ 674.79 |

| | | | |
|---|---|---|---|
| January 2006 | $ 27,984.33 | $ 559.69 | $ 631.49 | $ 71.80 |
| February 2006 | $ 27,984.33 | $ 559.69 | $ 637.89 | $ 78.20 |
| March 2006 | $ 27,984.33 | $ 559.69 | $ 622.43 | $ 62.74 |
| April 2006 | $ 22,823.33 | $ 456.47 | $ 507.15 | $ 50.68 |
| May 2006 | $ 22,823.33 | $ 456.47 | $ 492.36 | $ 35.89 |
| June 2006 | $ 22,823.33 | $ 456.47 | $ 475.22 | $ 18.75 |
| July 2006 | $ 22,823.33 | $ 456.47 | $ 481.50 | $ 25.03 |
| August 2006 | $ 22,823.33 | $ 456.47 | $ 483.81 | $ 27.34 |
| September 2006 | $ 24,323.33 | $ 486.47 | $ 512.73 | $ 26.26 |
| October 2006 | $ 25,323.33 | $ 506.47 | $ 673.09 | $166.62 |
| November 2006 | $ 25,323.33 | $ 506.47 | $ 526.49 | $ 20.02 |
| December 2006 | $ 25,323.33 | $ 506.47 | $ 527.51 | $ 21.04 |
| Totals for 2006 | | | | |
| rents | $298,362.96 | $5,967.30 | | |
| miscellaneous | $ 18,984.00 | $ 379.68 | | ($ 379.68) |
| | $346,227.96 | $6,346.98 | $6,571.67 | $ 224.69 |
| | | | | |
| January 2007 | $ 25,323.33 | $ 506.47 | $ 526.79 | $ 20.32 |
| February 2007 | $ 26,823.33 | $ 536.47 | $ 590.24 | $ 53.77 |
| March 2007 | $ 26,073.33 | $ 521.47 | $ 546.90 | $ 25.43 |
| April 2007 | $ 26,073.33 | $ 521.47 | $ 543.98 | $ 22.51 |
| May 2007 | $ 26,073.33 | $ 521.47 | $ 546.30 | $ 24.83 |
| June 2007 | $ 29,573.33 | $ 591.47 | $ 616.61 | $ 25.14 |
| July 2007 | $ 29,834.33 | $ 596.69 | $ 625.62 | $ 28.93 |
| August 2007 | $ 29,834.33 | $ 596.69 | $ 636.43 | $ 39.74 |
| September 2007 | $ 29,944.33 | $ 598.89 | $ 634.53 | $ 35.64 |
| October 2007 | $ 29,874.33 | $ 597.49 | $ 637.30 | $ 39.81 |
| November 2007 | $ 29,874.33 | $ 597.49 | $ 746.98 | $149.49 |
| December 2007 | $ 29,874.33 | $ 597.49 | $ 597.49 | $ 0.00 |
| Totals for 2007 | | | | |
| rents | $200,992.20 | $6,783.56 | | |
| miscellaneous | $ 0.00 | $ 0.00 | | |
| | $339,175.96 | $6,783.56 | $7,249.17 | $465.61 |
| | | | | |
| January 2008 | $ 30,004.33 | $ 600.09 | $ 667.68 | $ 67.59 |
| February 2008 | $ 30,014.33 | $ 600.29 | $ 637.50 | $ 37.21 |
| March 2008 | $ 30,004.33 | $ 600.09 | $ 639.60 | $ 39.51 |
| April 2008 | $ 29,934.33 | $ 598.69 | $ 635.83 | $ 37.14 |
| May 2008 | $ 30,014.33 | $ 600.29 | $ 620.33 | $ 20.04 |
| June 2008 | $ 29,883.33 | $ 597.67 | $ 630.48 | $ 32.81 |
| July 2008 | $ 29,888.33 | $ 597.77 | $ 631.28 | $ 33.51 |
| August 2008 | $ 27,373.33 | $ 547.47 | $ 582.49 | $ 35.02 |
| September 2008 | $ 28,163.33 | $ 563.27 | $ 587.37 | $ 24.10 |

| | | | |
|---|---|---|---|
| October 2008 | $ 28,173.33 | $   563.47 | $   678.17 | $ 114.70 |
| November 2008 | $ 31,373.33 | $   627.47 | $   627.47 | $    0.00 |
| December 2008 | $ 26,137.22 | $   522.74 | $   522.74 | $    0.00 |
| Totals for 2008 | | | | |
|     rents | $350,948.85 | $7,019.31 | | |
|     miscellaneous | $  15,864.00 | $   317.28 | | ($ 317.28) |
| | $366,812.85 | $7,336.59 | $7,460.94 | $ 124.35 |
| | | | | |
| January 2009 | $ 26,927.03 | $   538.54 | $   528.54 | ($10.00) |
| February 2009 | $ 27,999.67 | $   559.99 | $   563.99 | $   4.00 |
| March 2009 | $ 27,394.33 | $   547.89 | $   553.89 | $   6.00 |
| April 2009 | $ 25,380.33 | $   507.61 | $   507.61 | $   0.00 |
| May 2009 | $ 26,952.82 | $   539.06 | $   539.06 | $   0.00 |
| June 2009 | $ 27,220.60 | $   544.41 | $   544.41 | $   0.00 |
| July 2009 | $ 28,753.33 | $   575.07 | $   544.41 | ($30.66) |
| August 2009 | $ 29,012.33 | $   580.25 | $   604.91 | $ 24.66 |
| September 2009 | $ 30,223.33 | $   604.47 | $   604.47 | $   0.00 |
| October 2009 | $ 27,963.33 | $   559.27 | $   559.27 | $   0.00 |
| November 2009 | $ 27,993.33 | $   559.87 | $   559.87 | $   0.00 |
| December 2009 | $ 28,973.33 | $   579.47 | $   579.47 | $   0.00 |
| Totals for 2009 | | | | |
|     rents | $334,793.76 | $6,695.90 | | |
|     miscellaneous | $       0.00 | $       0.00 | | |
| | $334,793.76 | $6,695.90 | $6,689.90 | ($   6.00) |
| | | | | |
| January 2010 | | | | |
|     rent | $ 31,653.33 | $   633.07 | $   701.21 | $ 68.14 |
| February 2010 | | | | |
|     rent | $ 30,643.64 | $   612.87 | | |
|     miscellaneous | $     788.13 | $    15.76 | $   660.14 | $ 31.51 |
| March 2010 | | | | |
|     rent | $ 30,573.33 | $   611.47 | | |
|     miscellaneous | $     791.64 | $    15.83 | $   652.15 | $ 24.85 |
| April 2010 | | | | |
|     rent | $ 30,573.33 | $   611.47 | | |
|     miscellaneous | $     408.95 | $     8.18 | $   657.31 | $ 37.66 |
| May 2010 | | | | |
|     rent | $ 30,573.33 | $   611.47 | | |
|     miscellaneous | $     644.10 | $    12.88 | $   650.28 | $ 25.93 |
| June 2010 | | | | |
|     rent | $ 30,573.33 | $   611.47 | $    0.00 | ($611.47) |
|     miscellaneous | $   2,412.00 | $    48.24 | $    0.00 | ($ 48.24) |

Totals for January through June 2010

| | | | | |
|---|---|---|---|---|
| rent | $184,590.29 | $3,691.82 | | |
| miscellaneous $ | 5,044.82 | $ 100.89 | | |
| | | $3,792.71 | $3,321.09 | ($471.62) |

*See* COLL. TRIAL EX. 11; COLL. TRIAL EX. 21 at Ex. E.[17]  Based upon the Shopping Center's gross

monthly receipts set forth above, the Defendant was entitled, under the Management Agreement, to

receive $66,320.22 in management fees for the period beginning in February 2001 and ending in

June 2010, but paid himself $69,465.86, resulting in the Defendant's overpayment of management

fees to himself in the amount of $3,145.64.

The Plaintiff also contends that the Defendant breached his fiduciary duty by commingling

monies belonging to him or one of his companies with funds belonging to the Shopping Center.  In

his expert report, Mr. Costello made the following determination:

> Gaudiano comingled [sic] his personal funds and the funds of other entities
> controlled by him with the operating funds of Lingham Rawlings.  Based upon my
> review of the available financial records for the Property for the period May 2001
> through June 7, 2010 (the Gaudiano Management Period), Gaudiano's payments to
> himself and to entities he controlled from Lingham Rawlings's operating account (the
> Operating Account) exceeded deposits to the Operating Account made by Gaudiano
> and entities he controlled by $114,700.  Even assuming that some amount of this
> excess was rightly payable to Gaudiano as management fees, Gaudiano still paid
> himself and entities he controlled an excess of at least $43,064, and as much as
> $50,132, over deposits made by Gaudiano and such entities during the Gaudiano
> Management Period.

COLL. TRIAL EX. 21 at 2.  At trial, the Defendant testified candidly that between 2002 and 2009, he

advanced money to the Operating Account when cash flow was low, when improvements were

needed but he had not requested and/or obtained funds from the lender reserve accounts, and when

---

[17] The figures for June 2010 also comport with the Defendant's Management Fee invoice dated June 2010, which reflects a fee due and owing of $659.71.  *See* TRIAL EX. 15.

the payment for the Plaintiff's line of credit would automatically draft from the Operating Account

on the fourth of each month, prior to his having collected the rents, and cause an overdraft, he would

deposit money from one of his other accounts then reimburse himself once rents were collected.  The

Defendant also testified that although there was no written documentation of these loans or advances

other than the ledgers reflecting deposits into the Operating Account and checks being paid out, he

had made Ms. Power aware of this practice, that he had spoken with her on more than one occasion

about it, had asked her for money, had finally encouraged her to obtain a loan, which she did, and

from which the Defendant testified he used for tenant improvements, and that he had recorded these

advances on the annual balance sheets as "Loans Payable."  The Plaintiff, however, testified that she

was unaware that the Defendant was advancing any such funds and that she had only been alerted

to the "Loans Payable" entry by her accountant.  Nevertheless, although she had not known what the

"Loans Payable" were for, the Plaintiff testified that she had not contacted the Defendant for an

explanation of the "Loans Payable" entry on the financial statements.

The ledger for 2001 does not include a "Loans" column; this column first appears in 2002,

and continues appearing in the ledger for every year through 2010.  *See* COLL. TRIAL EX. 11.  Per the

year-end balance sheets prepared by the Defendant, the Plaintiff had the following "Loans Payable"

balances for each year:

December 31, 2002    $  29,687.50
December 31, 2003    $  48,999.98
December 31, 2004    $  55,798.22
December 31, 2005    $  58,265.83
December 31, 2006    $  89,049.16
December 31, 2007    $  88,499.16
December 31, 2008    $104,653.55

December 31, 2009    $  81,842.53
June 30, 2010    $    0.00

COLL. TRIAL EX. 12; COLL. TRIAL EX. 12A.  At trial, the Defendant testified that the advances he made were greater before the Plaintiff got a loan in 2006 for tenant improvements and that later advances were made in smaller amounts.  A year-by-year review of the ledgers prepared by the Defendant, however, exposes discrepancies between the numbers reflected therein and the numbers provided to the Plaintiff by the Defendant on the year-end balance sheets.  The following breakdown reflects the total monies deposited into the Operating Account and withdrawn or reimbursed from that account that are denoted within the ledgers for each individual year as "Loans" within Collective Trial Exhibit 11, and what should be the resulting remaining "Loans Payable" amount carried forward each year compared to the final "Loans Payable" figure shown on the year-end balance sheet for each year and the difference between the two.  There are no figures for 2001, because the ledgers do not reflect any loans payable in 2001, nor does the balance sheet ending December 31, 2001 reflect a "Loans Payable" entry.

| year | deposited | reimbursed | resulting | carry forward | balance sheet | difference |
|------|-----------|------------|-----------|---------------|---------------|------------|
| 2002 | $ 56,000.00 | $ 33,000.00 | $23,000.00 | $ 23,000.00 | $ 29,687.50 | $6,687.50 |
| 2003 | $ 31,312.48 | $ 12,000.00 | $19,312.48 | $ 42,312.48 | $ 48,999.98 | $6,687.50 |
| 2004 | $ 12,798.24 | $  5,000.00 | $ 7,798.24 | $ 50,110.72 | $ 55,798.22 | $5,687.50 |
| 2005 | $ 30,060.00 | $ 29,000.00 | $ 1,060.00 | $ 51,170.72 | $ 58,265.83 | $7,095.11 |
| 2006 | $ 37,783.33 | $  7,000.00 | $30,783.33 | $ 81,954.05 | $ 89,049.16 | $7,095.11 |
| 2007 | $ 20,350.00 | $ 10,900.00 | $ 9,450.00 | $ 91,404.05 | $ 88,499.16 | ($2,904.89) |
| 2008 | $ 32,150.00 | $ 19,000.00 | $13,150.00 | $104,554.05 | $104,653.55 | $   99.50 |
| 2009 | $ 17,433.76 | $ 40,244.78 | ($22,811.02) | $ 81,743.03 | $ 81,842.53 | $   99.50 |
| 2010 | $    0.00 | $ 81,842.53 | ($81,842.53) | ($   99.50) | $    0.00 | $   99.50 |
| total | $237,887.81 | $237,987.31 | | | | $   99.50 |

COLL. TRIAL EX. 11.  As established by these figures, the Defendant reimbursed himself for $99.50

over the loans payable reflected on the balance sheets and the ledgers that he prepared.  The

Defendant also prepared a summary of Loans and Repayments made by him or one of his companies

to the Plaintiff as well as payments made to him or one of his companies from the Operating

Account.  Trial Exhibit 27, which includes individual dates, check numbers, and amounts deposited

and/or paid, reflects the following as summarized by the court:

| year | total deposited | total reimbursed | balance forward |
|------|-----------------|------------------|-----------------|
| 2002 | $  62,687.50 | $  33,000.00 | $  29,687.50 |
| 2003 | $  31,312.48 | $  12,000.00 | $  48,999.98 |
| 2004 | $  17,798.24 | $  11,000.00 | $  55,798.22 |
| 2005 | $  31,467.61 | $  29,000.00 | $  58,265.83 |
| 2006 | $  37,783.33 | $    7,000.00 | $  89,049.16 |
| 2007 | $  20,350.00 | $  20,900.00 | $  88,499.16 |
| 2008 | $  40,274.74 | $  24,120.35 | $104,653.55 |
| 2009 | $  17,433.76 | $  40,244.78 | $  81,842.53 |
| 2010 | $          0.00 | $  81,842.53 | $          0.00 |
| total | $259,107.66 | $259,107.66 | |

TRIAL EX. 27.  Clearly, there are discrepancies between the amounts shown on the ledgers and on

the Defendant's summary.

The numbers reflected in the ledgers and summary prepared by the Defendant also differ

from those reflected in Exhibits A and B to Mr. Costello's expert report.  Exhibit A, a Schedule of

Payments of Gaudiano and Entities Owned and/or Controlled by Him Per Deposit Information

Provided for the Period From March 13, 2001 Through December 15, 2008,[18] was prepared by

Mr. Costello based upon his review of the deposit information for the Operating Account for that

---

[18] In his expert report, Mr. Costello states that the Defendant "was unable to produce deposit records subsequent to December 15, 2008[; however,] Gaudiano states in Defendant's Response to Plaintiff's First Interrogatories, #4, that Plaintiff has all records which include any amounts advanced or otherwise deposited into the account of Plaintiff. Therefore, deposit records through December 15, 2008 would include all amounts deposited by him to Plaintiff's account." COLL. TRIAL EX. 21 at 7.

period and reflects the following deposits made from the Defendant or one of his entities into the

Operating Account:

| date | entity deposit received from | deposit amount | year-end total |
|------|------------------------------|----------------|----------------|
| 12/27/01 | Station West | $ 196.89 | |
| 12/28/01 | Station West | $ 2,845.00 | |
| | | | $ 3,041.89 |
| | | | |
| 1/30/02 | Station West | $ 8,000.00 | |
| 2/28/02 | Olympic Insurance Group | $ 8,000.00 | |
| 3/31/02 | Olympic Insurance Group | $ 750.00 | |
| 7/3/02 | Olympic Insurance Group | $10,000.00 | |
| 8/6/02 | Olympic Insurance Group | $ 5,000.00 | |
| 8/12/02 | Olympic Insurance Group | $25,000.00 | |
| | | | $ 56,750.00 |
| | | | |
| 1/6/03 | MCIC Ltd. | $ 5,000.00 | |
| 5/6/03 | Station West | $ 5,000.00 | |
| 5/21/03 | Station West | $ 3,000.00 | |
| 6/2/03 | Sal Gaudiano | $ 2,128.24 | |
| 7/8/03 | Miners Compensation | $ 3,000.00 | |
| 8/15/03 | Miners Compensation | $10,000.00 | |
| 11/19/03 | Station West | $ 5,000.00 | |
| | | | $ 33,128.24 |
| | | | |
| 6/14/04 | Station West | $ 5,000.00 | |
| 10/13/04 | Station West | $ 6,000.00 | |
| 12/3/04 | Station West | $ 5,000.00 | |
| | | | $ 16,000.00 |
| | | | |
| 1/5/05 | Station West | $ 7,000.00 | |
| 4/25/05 | Station West | $ 1,000.00 | |
| 6/20/05 | Station West | $ 2,500.00 | |
| 8/3/05 | Station West | $10,000.00 | |
| 9/8/05 | Sal Gaudiano | $ 1,200.00 | |
| | | | $ 21,700.00 |
| | | | |
| 1/17/06 | Station West | $ 2,000.00 | |
| 3/3/06 | Station West | $ 5,000.00 | |
| 3/24/06 | Station West | $ 6,000.00 | |
| 3/27/06 | Station West | $ 5,000.00 | |

| | | | |
|---|---|---|---|
| 4/4/06 | Station West | $17,783.33 | |
| 8/11/06 | Station West | $ 2,000.00 | |
| | | | $ 37,783.33 |
| | | | |
| 4/3/07 | Station West | $ 2,000.00 | |
| 5/29/07 | Station West | $ 5,000.00 | |
| 6/11/07 | Station West | $ 5,000.00 | |
| 8/6/07 | Station West | $ 7,000.00 | |
| | | | $ 19,000.00 |
| | | | |
| 4/17/08 | Station West | $ 7,000.00 | |
| 5/8/08 | Station West | $ 5,000.00 | |
| 7/21/08 | Station West | $ 4,000.00 | |
| 8/14/08 | Station West | $ 5,000.00 | |
| | | | $ 21,000.00 |
| | | | $208,403.46 |

COLL. TRIAL EX. 21 at Ex. A.  Exhibit B, Schedule of Payments to Gaudiano and Entities Owned and/or Controlled by Him For the Period From March 13, 2001 Through June 7, 2010, was also prepared from Mr. Costello's review of the Operating Account's check stubs and is a three-page exhibit identifying by payee, date, check number and amount, all payments written out of the Operating Account payable to the Defendant and/or one of his companies and reflects the following Summary at the bottom of page three:

Summary by Payee

| | |
|---|---|
| Briarcliff | $    5,089.92 |
| Sal Gaudiano | $  41,994.82 |
| Station West | $ 231,483.68 |
| Miners | $  19,546.37 |
| Olympic | $   25,000.00 |
| | $ 323,114.79 |

COLL. TRIAL EX. 21 at Ex. B.

Although they contain similar breakdowns, including dates, check numbers, and amounts, a comparison between the ledgers and the Defendant's summary and the summaries prepared by Mr. Costello yields even more discrepancies.  For example, both Trial Exhibit 27 and Exhibit B to Mr. Costello's expert report contain dates, check numbers, and amounts, and although some of the information matches, there are a number of entries that do not.  Exhibit B reflects three payments that are also reflected on Trial Exhibit 27; however, the check numbers listed are not identical:  (1) a payment on February 26, 2003, to the Defendant in the amount of $4,000.00 via check #1474 on Exhibit B but listed as check #1475 on Trial Exhibit 27; (2) a payment on March 16, 2005, to Station West in the amount of $5,000.00 via check #1959 on Exhibit B but listed as check #1960 on Trial Exhibit 27; and (3) a payment on May 1, 2006, to Station West in the amount of $5,000.00 via check #2204 on Exhibit B but listed as check #2205 on Trial Exhibit 27.  *Compare* COLL. TRIAL EX. 21 at Ex. B *with* TRIAL EX. 27.  These documents also reflect a payment on September 20, 2006, to Station West via check #2271; however, Exhibit B lists the amount as $6,599.00, while Trial Exhibit 27 lists the amount as $2,000.00.  *Compare* COLL. TRIAL EX. 21 at Ex. B *with* TRIAL EX. 27. Exhibit B also lists a payment on October 15, 2007, payable to Station West in the amount of $5,300.87 via check #2532, that is not included within the running balance total shown on Trial Exhibit 27, but appears to match up with a payment on October 11, 2007, payable to KUB in the amount of $5,300.87 via check #2546, which is located in a separate section on the last page of Trial Exhibit 27, below the running total and below a notation that "THE FOLLOWING CHECKS WERE PAID BY STATION WEST BUT NOT POSTED TO BRIARCLIFF[.]"  *Compare* COLL. TRIAL EX. 21 at Ex. B *with* TRIAL EX. 27.  Finally, there were three payments listed as having been reimbursements on Trial Exhibit 27 that were not listed on Exhibit B: (1) a payment in 2003 via

check #1529 in the amount of $3,000.00; (2) a payment in 2003 via check #1612 in the amount of $5,000.00; and (3) a payment in 2009 via check #2845 in the amount of $2,000.00. *Compare* COLL. TRIAL EX. 21 at Ex. B *with* TRIAL EX. 27.

Even taking into account the Defendant's testimony that some of the entries he considered loans payable were for reimbursement of items that would not necessarily have been direct deposits and/or reimbursements to and from the Operating Account, such as payments to vendors on the Plaintiff's behalf, the fact remains that the Defendant's own records concerning the monies flowing in and out of the Operating Account do not match up.  Mr. Costello's analysis, based upon the deposit slips and check stubs, evidence that during the time he managed the Shopping Center, a total of $208,403.46 was deposited into the Operating Account by the Defendant and/or one of his companies, and a total of $323,114.79 was paid out of the Operating Account, leaving a difference of $114,711.33.  Subtracting $66,320.22, the amount that the court has previously determined the Defendant was entitled to receive as his management fee, the court finds that the Defendant paid himself and/or his companies $48,391.11 from the Operating Account that cannot be accounted for or attributed to any fee due or loan payable.

The Plaintiff also argues that the Defendant reimbursed himself for maintenance and repair expenses and supplies in an amount greater than what was reasonable.  In support of these averments, the Plaintiff relied on Mr. Costello's testimony that, based upon his review, $128,377.00 attributed to tenant improvement draws were without supporting documentation, and his expert report in which he made the following determination:

> Based upon my review of the available financial records for the Property during the Gaudiano Management Period, Gaudiano's withdrawals from certain escrow accounts maintained by or on behalf of Lingham Rawlings's secured lenders for tenant improvements (the Tenant Improvement Escrow) during the Gaudiano Management Period exceeded the available documentation evidencing the necessity for such withdrawals by approximately $139,300. Based upon my experience, it is my expert opinion that this substantial amount of funds withdrawn from the Tenant Improvement Escrow in excess of supporting documentation is consistent with (i) professional negligence with respect to Gaudiano's management of the Property (ii) appropriation of Lingham Rawlings's funds for Gaudiano's own use, or for the use of other entities owned or controlled by him, and (iii) the appearance of fraud. This conclusion is further supported by the questionable nature of the documentation supporting certain withdrawals.

COLL. TRIAL EX. 21 at 3. Specifically, with respect to tenant improvements, Mr. Costello "noted discrepancies between the amounts documented, the amounts deposited and the amounts reflected as tenant improvements per the balance sheets generated by Gaudiano as compiled[.] . . . . [I]t is my opinion that an experienced and knowledgeable property manager would maintain files documenting all draw requests made, whether for tenant improvements, major repairs or any other item. Without that documentation which verifies that improvements were actually made to the property, an independent reviewer is unable to determine that these funds were actually expended on improvements to the subject property." COLL. TRIAL EX. 21 at 10-11.

Under the Promissory Note with Bridger Commercial Funding, the Plaintiff was required to pay funds into escrow for tenant improvements and capital improvements. Exhibit A to Promissory Note Additional Terms and Conditions sets forth the following procedures required to receive funds from the lender being held in the various impound or escrow accounts:

3.2 <u>Application</u>.

. . . .

(c) <u>Tenant Improvements</u>.  If no Default or event which, with the giving of notice or the passage of time, or both, would constitute a Default exists, Lender shall release the Impounds to Borrower as necessary to pay or reimburse Borrower for the tenant improvements, brokerage commissions, and leasing costs stated above; <u>provided</u>, <u>however</u>, that Lender shall have received and approved each of the following for each tenant for which such costs were incurred:

(i) Borrower's written request for such release, stating the name, location and net rentable area of the tenant and a description and cost breakdown of the leasing costs or tenant improvements covered by the request,

(ii) Borrower's certification that the tenant improvements have been completed lien-free and in a workmanlike manner,

(iii) a fully executed lease, or extension or renewal of the current lease,

(iv) an estoppel certificate executed by the tenant including its acknowledgment that all tenant improvements have been satisfactorily completed, and

(v) such other information with respect to such costs as Lender may request.

(d) <u>Immediate Repair Work</u>.  If no Default or event which, with the giving of notice or the passage of time, or both, would constitute a Default exists, Lender shall release the Impounds to Borrower once a calendar quarter to pay or reimburse Borrower for the Immediate Repair Work stated above; <u>provided</u>, <u>however</u>, that Lender shall have received and approved each of the following:

(i) Borrower's written request for such release, describing the Immediate Repair Work and a cost breakdown thereof in reasonable detail, and certifying that all such Immediate Repair Work has been completed lien-free and in a workmanlike manner, and

(ii) an inspection report signed by an inspector selected by Lender, whose fees and expenses shall be paid by Borrower, and such other evidence as Lender shall require, confirming Borrower's certification.

(e) <u>Capital Improvements</u>.  If no Default or event which, with the giving of notice or the passage of time, or both, would constitute a Default exists, Lender shall release the Impounds to Borrower once a calendar quarter to pay or reimburse Borrower for the Capital Improvements; <u>provided</u>, <u>however</u>, that Lender shall not [be] obligated to release any Impounds for Capital Improvements in an amount less

81

than $2,500 per release; and that Lender shall have received and approved each of the following:

> (i) Borrower's written request for such release, describing the Capital Improvements and a cost breakdown thereof in reasonable detail, and certifying that all such Capital Improvements have been completed lien-free and in a workmanlike manner, and

> (ii) an inspection report signed by an inspector selected by Lender, whose fees and expenses shall be paid by Borrower, and such other evidence as Lender shall require, confirming Borrower's certification.

TRIAL EX. 18 at 11-12. Through his testimony, the Defendant confirmed that the foregoing procedures were followed, that in order to receive reimbursements, he was required to fill out a form stating the purpose, payee, check number and amount, get a release and W-9 from each vendor, and then submit an invoice and copy of the check to the lender. The Defendant also testified that he made the decision whether to request reimbursement and if repairs cost less than $1,000.00, he did not bother requesting reimbursement, explaining that he had been unaware initially that he could request reimbursement for regular maintenance.

Irrespective of the fact that the Defendant's files were not maintained well and that it is difficult for an independent reviewer to determine whether monies received for tenant improvements were actually spent on tenant improvements, the record reflects that in order to be reimbursed by the lender from the tenant improvement escrow account, the Defendant was required to pay the expenses first and then submit documentation to the lender. Because of the strict requirements imposed upon the Defendant in order to receive these reimbursements, the court is satisfied that all of the funds received by the Plaintiff for tenant improvements were, in fact, spent on tenant improvements. The

same, however, cannot be said concerning the $20,000.00 broker commission draw addressed by

Mr. Costello in his expert report as follows:

> [I]n my analysis of the folder provided by Gaudiano titled Escrow, documentation for a $20,000 draw for broker commission was reviewed. The fax transmittal form, dated February 8, *2009*, attached to the draw request is from Sal Gaudiano to Allen Smith Re Key Loan 01002318 Escrow Request. The Reserve Withdrawal Request Summary that is attached is dated February 8, *2006* and lists two checks to Heath Shuler Realty for reimbursement: check number 2132 dated January 5, *2006* for $10,000 and check number 2158 dated February 8, *2006* for $10,000. Copies of these checks are attached to the draw request. Also included with this request is a letter from Joseph D. Chalmers of Heath Shuler Realty dated December 30, *2005*, the subject of which is an invoice for lease of new premises of Cingular Wireless PCS for $20,000. The Fourth Amendment to Lease Agreement for Extension of Term is attached also and it is dated November 1, *2005*. There is no explanation or other documentation as to why checks written in 2006, a lease extension dated 2005 and a letter dated 2005 are attached as documentation for a draw request made in 2009.

> Furthermore, the February 2009 bank statement does not include a deposit during the month large enough to include a $20,000 draw. In fact, total deposits for the month are $24,299.67. I reviewed the check stubs for the operating account and no such deposit is reflected there. The first deposit over $20,000 after the draw request is on March 6 and it is recorded as rent income. Therefore, it does not appear that the $20,000 requested on February 8, 2009 for broker commission reimbursement was actually deposited to the operating account for the Lingham Rawlings property.

COLL. TRIAL EX. 21 at 11. Unlike Mr. Costello, the court is less concerned with the dates of the

requests in comparison to the dates of the services for which reimbursement was sought; it was up

to the lender to question the Defendant about the length of time between the invoice and a request

for reimbursement. The court is, however, concerned that the $20,000.00 was never deposited into

the Operating Account as reimbursement of funds that were presumably paid to Mr. Chalmers in

2006. Because there is no record of that $20,000.00 being deposited, the court can only conclude

that it was not, and the Defendant used it for purposes other than reimbursement to the Plaintiff.

With respect to excessive supplies, repairs, and maintenance costs, the Plaintiff relies upon

Mr. Costello's determination that:

> [t]he available financial information for the Property, including operating statements prepared and provided by Gaudiano, exhibits costs of operation that materially exceed (i) industry norms for comparable commercial property during the Comparable Period, primarily in the categories of property maintenance and repair, and (ii) current management's non-utility costs of operations during the Post-Bankruptcy Period.  Specifically, Gaudiano spent (i) at least $230,505 (or 71%) and as much as $292,215 (or 113%) more on property maintenance and repair than the industry norm for comparable commercial property during the Comparable Period and (ii) approximately $33,660 per year for non-utility expenditures (or 35%) more than current management spent during the Post-Bankruptcy Period (or an aggregate of $185,130 in excess expenditure extrapolated over the span of the Comparable Period).  These costs are not evidenced or supported by adequate vendor invoices or other documentation demonstrating that Gaudiano's relatively high expenditures were incurred for the benefit of Lingham Rawlings or the Property.

COLL. TRIAL EX. 21 at 3.  In making his analysis, Mr. Costello utilized data from the International

Council of Shopping Centers *Dollars & Cents of Shopping Centers/The Score 2008*, which is a joint

publication between the International Council of Shopping Centers and the Urban Land Institute that

"compiles data from shopping center owners and operators . . . for comparison and analysis of

shopping centers of varying types, sizes and geographic locations. . . . [and] while it is not a

statistically reliable sample, it should be considered broadly representative of the range of operating

characteristics found within the shopping center industry[.]" COLL TRIAL EX. 21 at 4.  Mr. Costello

then compared the average costs incurred by the Defendant in his operation of the Shopping Center

with the publication's analysis of convenience centers operating in the south and open air centers

operating throughout the United States, providing a detailed average cost per square foot of $1.43

for convenience centers and an average cost per square foot of $1.77 for open air centers, finding that

the "average cost per square foot for the years from 2005 through mid 2010 in which Gaudiano

managed the property is $3.04[, which] is $1.61 more than that for convenience centers in the south and $1.27 more than for open air centers of similar size throughout the country." COLL. TRIAL EX. 21 at 5.

Mr. Costello also compared the average costs for supplies, maintenance, and repairs with those incurred by the Plaintiff in the months since the Defendant has no longer served as the Shopping Center's manager, deducing that "the property's non-utilities expenses have been significantly reduced since Gaudiano's departure." COLL. TRIAL EX. 21 at 6. According to Mr. Costello's analysis, the total of non-utility expenses incurred between July 2010 and June 2011 averaged $2.96 per square foot. TRIAL EX. 35. Mr. Costello's analysis of these average costs per square foot of total maintenance and housekeeping expenses is summarized on Trial Exhibit 35, in which he deduced that, based upon the Shopping Center's 33,000 square footage and the years that the Defendant managed the Shopping Center, the Plaintiff overpaid an average of $1.61 more per square foot than the average of convenience centers in the south, $1.27 more per square foot than the average of open air centers in the United States with less than 40,000 square feet, and an average of $1.02 more than Ms. Power in the months since she took over management of the Shopping Center. TRIAL EX. 35.

Included as exhibits to his expert report are a Summary of Income Statements for Lingham Rawlings Property as Provided by Gaudiano and the Operating Expenses of Lingham Rawlings Property for the Twelve Months After Gaudiano Departure as Manager. *See* COLL. TRIAL EX. 21 at Ex. G-1, Ex. J. Although they are not identical, these summaries contain several non-utility categories that are the same or similar; however, each also lists categories that are not included

within the other's summary from which the court has calculated the Defendant's and the Plaintiff's

average monthly costs determined by the total number of months each managed the Shopping

Center:

| | Defendant's costs[19] | Plaintiff's costs[20] | difference |
|---|---|---|---|
| facility maintenance | $    710.33 | $ 1,324.74 | ($    614.41) |
| building repairs | $ 1,032.90 | $ 2,616.07 | ($ 1,583.17) |
| waste removal | $    598.06 | $    321.74 | $    276.32 |
| other/miscellaneous | $      31.17 | $      20.80 | $      10.37 |
| maintenance labor | $ 1,599.04 | $    896.09 | $    702.95 |
| tenant repairs | $    680.04 | | $    680.04 |
| supplies | $ 1,041.33 | $      20.78 | $ 1,020.55 |
| lawn maintenance | $ | $      33.91 | ($      33.91) |
| pest control | $ | $    110.52 | ($    110.52) |
| totals | $ 5,692.87 | $ 5,344.65 | $    348.22 |

*Compare* COLL. TRIAL EX. 21 at Ex. G-1 *with* Ex. J. [21]  In looking at these figures, the expense paid

by the Defendant that stands out between the two is the approximately $1,000.00 spent for supplies

each month, while the Plaintiff has, on average, paid substantially more for building repairs than the

Defendant did.

At trial, the Defendant testified that he determined what supplies, repairs, and maintenance

were needed, that he negotiated and approved the costs for the same, and that he entered into

---

[19] The court has averaged the total costs for each year as reflected from the income statements and divided by the one hundred thirteen months that the Defendant managed the Shopping Center. *See* COLL. TRIAL EX. 27 at Ex. G-1.

[20] These figures are derived from the annual costs divided by the twelve months – July 2010 through June 2011 – that are included within Exhibit J, plus the subsequent eleven months, through May 2012, as found within the Plaintiff's Monthly Operating Reports filed with the court and entered into evidence as Collective Trial Exhibit 16. *See* COLL. TRIAL EX. 27 at Ex. J; COLL. TRIAL EX. 16.

[21] Exhibit G-1 and Collective Exhibit 16 also contained listings for management fees, interest expenses, property taxes, insurance, legal, real estate commissions, and depreciation that the court did not include within this analysis concerning excessive supplies, repairs, and maintenance.

contracts on the Plaintiff's behalf with contractors for work to be performed. No estimates or requests for approval were ever sent to Ms. Power other than the one instance in 2007, when she was required to obtain a line of credit with Citizens National Bank for significant tenant improvements. In addition to various contractors, the Defendant also employed Wayne Elliott and Charles Miller to perform regular maintenance for the Shopping Center, and he authorized Mr. Elliott to purchase supplies and materials necessary for any repairs, providing him with blank checks. Nevertheless, the Defendant did not keep copies of any estimates for maintenance or repair work that he received, testifying that he was not required to submit them to the lender. When questioned at trial about how these expenses were listed in the ledgers, the Defendant stated the following:

> Q. Okay. Throughout . . . Exhibit 11 there are categories of expenses and with respect to repairs and maintenance – and we can pick any one to use as an example – but you have a separate column for Building Maintenance, a separate column for Maintenance Labor, a separate column . . . for Tenant Repairs, a separate column for Building Repairs, and a separate column for Supplies, correct?

> A. Correct.

> Q. With respect to Supplies, generally, in the supply category there would be an expenditure of as little as – let's see – they were, generally, about a thousand dollars a month, would you agree with that, spent on supplies on average?

> A. Yes.

> Q. Okay. You didn't have a specific procedure for determining whether a purchase fit within the category of supplies in the financial statements versus repairs, did you, or did you?

> A. If it was materials that I paid for, I charged supplies.

> Q. Okay.

> A. And that was, basically, various vendors.

Q. Okay. There are check stubs – and those are scheduled or itemized in Exhibit 9 if you want to refer to them – but would you disagree that between, during the period of your management of the shopping center at 7212 Kingston Pike on behalf of Lingham Rawlings there was more than $30,000 in checks written to Home Depot? Would you disagree with that?

A. Over the 9-1/2 years?

Q. Yes.

A. Probably.

Q. Okay. And a similar amount, $27,000, written to Lowe's, correct?

A. Correct. . . . I mean, that's reasonable.

Q. Okay. And $30,000 to Sam's Club? Do you have any reason to disagree that that occurred?

A. No.

Q. Okay. Then there were also checks from time to time written to WalMart and Kmart, correct?

A. Yes.

TR. at 351-353. In defense of these figures, the Defendant was later asked, during his re-direct concerning these expenses, to take the total amount spent at Home Depot, Lowe's, and Sam's Club, divide them by the 9.3 years he managed the Shopping Center, and then again by twelve to get the approximate monthly averages of $268.00 to Home Depot, $242.00 to Lowe's, and $268.00 to Sam's Club, respectively.

Although the court agrees with Mr. Costello's statement that "[a]n area of concern in this case in light of the significantly high maintenance and repair costs is the lack of vendor invoices and related documentation providing evidence that these funds were actually expended on the Lingham

Rawlings property[,]" COLL TRIAL EX. 21 at 6, the court does not find that a comparison of the Shopping Center to convenience or open air shopping centers as reflected in the publication relied upon by Mr. Costello to be persuasive.  During cross-examination, Mr. Costello testified that his analysis was derived almost entirely from the documentation he reviewed, that he spent approximately fifteen minutes at the Shopping Center and that he did not spend any time talking to Wayne Elliott and/or Charles Miller, who performed maintenance, or Joe Chalmers, the leasing agent.  He also testified that when comparing the non-utility expenses incurred by the Plaintiff during the Defendant's tenure as manager to those since Ms. Power took over, the difference is roughly $1.00 per square foot and that Ms. Power has incurred expenses significantly higher than those for the convenience centers and open air centers as well.  Accordingly, the court finds that the only comparison that is relevant is the difference between the expenses paid out while the Defendant was manager and those paid out since June 2010.

During her direct testimony, Ms. Power testified that she had purchased supplies a couple of times between June 2010 and July 2012.  As evidenced by the Plaintiff's monthly operating reports, there was only one entry for supplies, in January 2012.  However, in a direct comparison of the average monthly expenses expended by both the Plaintiff and the Defendant during their respective tenures evidences that although the parties may, for accounting purposes, call the expenses by different terms, there was not much difference in the Defendant's average monthly spending on behalf of the Shopping Center for what constituted repairs, maintenance, and supplies than there has been in the two years since Ms. Power took over the building's management.  The court finds that

the Defendant did not breach any fiduciary duty owed to the Plaintiff with respect to his spending

on those items.

In addition to the foregoing, the Plaintiff argues that the Defendant did not maintain proper

business records reflecting the Shopping Center's income and expenditures.  Based upon the record,

the court agrees with Mr. Costello's assessment in his expert report that "during the Guadiano

Management Period, Guadiano did not maintain accounting and financial records with respect to the

Property consistent with what would be expected of an experienced property or business manager."

COLL. TRIAL EX. 21.  The record reflects that when the Defendant turned over the Shopping Center's

financial records to Ms. Power, he provided her with two boxes of documents consisting of deposit

slips and checks, bank statements, check stubs, a few utilities bills, and a few invoices.  Based upon

this documentation, Mr. Williams, who is Ms. Power's son-in-law, prepared a spreadsheet using the

original check stubs reflecting that the Defendant and/or one of his entities received payments

between February 2001 and May 2010 totaling the following: $2,865.00 to Briarcliff Management,

$29,129.94 to Miners, $66,926.08 to Sal Gaudiano, and $227,804.68 to Station West.  COLL. TRIAL

EX. 9.

Additionally, this documentation reflects the following amounts which the Defendant

testified were spent on supplies and/or repair materials for that time period:  $7,844.71 at Co-Op,

$33,956.03 at Home Depot, $1,557.50 at K-Mart, $27,761.83 at Lowe's, $30,079.91 at Sam's Club,

and $2,469.48 at Walmart.  COLL. TRIAL EX. 9.  Finally, the check stubs, as summarized by

Mr. Williams, reflect the following amounts spent on construction and/or repairs that were easily

ascertainable or otherwise established through the Defendant's testimony for the period of 2001

through 2010: $30,781.75 to At Your Service, $205.00 to Bill's Gutter Repair, $8,000.00 to Brian

_____ Construction,[22] $12,094.85 to Broadway Carpet, $63,752.00 to C&D Construction, $525.00

to Charles Miller, $76,188.42 to Chuck's Drain, $650.00 to Commercial Painting Services,

$12,118.19 to Cornett Electric, $1,311.00 to Custom Doors, $2,478.38 to Fay Portable Buildings,

$270.63 to Friedman Appliance, $1,138.29 to Knoxville Discount Wallcovering, $5,082.00 to Law

Construction, $7,943.46 to Lindsey Maple, $741.90 to Modern Supply, $25,000.00 to Olympic,

$18,485.76 to Powell Brothers, $397.93 to Precast Concrete, $3,670.00 to Towe Welding, $5,289.00

to TSF Construction, and $14,436.40 to Wayne Elliott. COLL. TRIAL EX. 9. Finally, the check stubs

included the following payments to persons and/or businesses for purposes which were not readily

ascertainable: $645.66 to Able, $4,815.00 to Albert Gibson, $3,740.00 to Allen Schwartz, $928.63

to BP Signs, $123.39 to Battery Plus, $365.00 to Carl Green, $375.00 to Carl Sheen, $2,828.00 to

Charles Lovell, $37.00 to City of Knoxville, $3,214.00 to Darrell Hensley, $5,701.00 to Erie

Insurance, $750.00 to ETE Engraving, $120.00 to Fresh Cut Creations, $2,607.00 to Hannah Gibson,

$17,703.05 to Heath Shuler Realty, $5,619.73 to Howard and Howard, $28,148.00 to James Arp,

$2,650.00 to John Dawson, $308.00 to John Stone, $535.25 to Kelsar, $1,184.85 to Knox Tenn

Rental, $21,750.00 to Lee Olivey, $284.44 to Lewis _____, $1,473.77 to Lisa Brassler, $370.00 to

Michael Willis, $308.01 to Miller Brothers, $250.00 to Miltons, $838.37 to Northern, $424.97 to

Oreck, $143.00 to Robert Wilkinson, $785.00 to Scott Morrison, $1,111.72 to Sears, $1,709.00 to

Terry Smith, $2,185.00 to Timberly Trost, $265.65 to Tractor Supply, and $5,095.00 to William M.

---

[22] Presumably because they were illegible, a few entries for payees on the spreadsheets created by Mr. Williams
contained a question mark, which the court has denoted instead with a blank.

Lawrence.[23]  COLL. TRIAL EX. 9.  Mr. Williams testified that there were, however, no receipts or

invoices associated with any of those expenditures, that the only invoices contained in the boxes

provided to Ms. Power were from Chuck's Drain.

Similarly, Mr. Costello found, in his expert opinion, that the Defendant "did not maintain

accounting and financial records with respect to the Property consistent with what would be expected

of an experienced property or business manager."  COLL. TRIAL EX. 21 at 3.  Specifically,

Mr. Costello's expert report states the following observations and determinations based upon his

review of the Shopping Center's financial records provided to him:

> Based upon my review of the available financial records for the Property during the
> Gaudiano Management Period, it is my expert opinion that, during the Gaudiano
> Management Period, Gaudiano did not maintain accounting and financial records for
> the Property consistent with what would be expected of an experienced property or
> business manager.  Among other things, there is no evidence that Guadiano
> maintained (i) detailed general ledgers for the Property, (ii) all basic financial
> information in an orderly fashion, (iii) detailed vendor files or (iv) detailed tenant
> files, all of which would have been maintained by an experienced and knowledgeable
> manager of commercial property.  Based upon my experience, it is my expert opinion
> that such failure to maintain appropriate records is consistent with professional
> negligence with respect to Gaudiano's management of the Property.
>
> As manager of the property, Gaudiano was required by the management agreement
> to provide the owner, at a minimum, monthly statements of cash receipts and
> disbursements.  Additionally, as agreed between owner and manager, financial
> statements such as profit and loss statements and balance sheets were to be provided
> to owner.  In order to prepare such financial statements, a general ledger for the entity
> would have to be maintained which recorded transactions affecting the assets,
> liabilities, owner's equity, revenue and expense items of the property.  However,
> Mr. Gaudiano has been unable to provide such general ledgers pursuant to this

---

[23] Payments totaling $27,256.00 were paid to Realty Executives, presumably to Joe Chalmers who was the Plaintiff's leasing agent.  COLL. TRIAL EX. 9.  Additionally, payments totaling $1,265.40 were paid to Coulter & Justus, the Plaintiff's accountants, and $817.00 was paid to Albert Wilkinson for legal services, although the nature of those services was not explained.  COLL. TRIAL EX. 9.  Also included on the spreadsheet were four entries with an unknown payee: on February 15, 2001 in the amount of $843.21, on March 23, 2001 in the amount of $4,108.00, on April 5, 2002 in the amount of $100.00, and on October 21, 2002 in the amount of $2,078.50.  COLL. TRIAL EX. 9.

litigation.   As discussed previously and as presented in Exhibits G and G-1, Mr. Gaudiano did produce balance sheets, income statements and statements of cash flows.  These financial statements have not been audited, reviewed or even compiled by an outside Certified Public Accountant.  Therefore, we are using these financial statements without assurance or verification of the amounts presented in these financial statements or even the ability to trace the balances to detailed general ledgers.

It is my experience that an experienced property manager would maintain such general ledger records on a timely and contemporaneous basis.  These general ledgers would also be routinely backed up and archived for ready retrieval in the case of computer issues, requirements to provide statements from a prior period or to provide information as to amounts and dates of transactions recorded in the company's accounting records.  In my opinion, Mr. Gaudiano's apparent failure to maintain such general ledger records is negligent on his part.

The accounting records provided to Ms. Powers of Lingham Rawlings by Mr. Gaudiano for the property on or about June 10, 2010 only included copies of deposit slips through December 15, 2008.  The deposit slips for the period from December 15, 2008 through June 2010 were not on the premises and no explanation was given as to their whereabouts nor were they subsequently delivered.  Again, an experienced and knowledgeable property manager would be expected to maintain bank records in an orderly fashion and certainly the most recent records would be expected to be easily and readily obtainable.

Also lacking among the financial records produced by Gaudiano in June 2010 were vendor files containing copies of invoices paid from the property's operating account for goods or services provided to the property for the years during which Gaudiano managed the property[.]  A few files with a few invoices were produced; however, these files were only a few of the vendors and suppliers and contained very few invoices.  Some of the files actually contained invoices to Station West, one of Gaudiano's entities.  It was not apparent from my review that the Station West invoices observed were paid from Lingham Rawlings operating account, but it is another illustration of the comingling [sic] by Gaudiano of Lingham Rawlings and his own personally controlled entities.

It is my experience that an experienced and knowledgeable property manager would maintain files with the documentation for items paid by the property.  In my experience such files are normally maintained by vendor by fiscal year and all invoices received and paid by a business are kept in such files.  This constitutes the backup or verification for disbursements from the business's bank account.  An orderly and well-maintained accounting and recordkeeping system would contain, among other things, both a general ledger with the details of items charged to all

accounts of the business and the invoices paid by the business and recorded within
the general ledger.  Without those vendor records and invoices, a business is unable
to provide verification of the appropriateness and correctness of items paid by the
business.  If Lingham Rawlings should be audited by the Internal Revenue Service,
for example, without those files and accounting records there is no way to support the
legitimacy of items reported and deducted on its income tax return.

Another item missing from the accounting and financial records provided by
Gaudiano are tenant files.  In such a file, dependent upon the tenant's lease terms,
one would expect to locate copies of tenant payments, documentation for billing to
and receipt from tenants for items such as utilities, property taxes, tenant
improvements, common area expenses, or other items which might have been billed
to and received from the tenants.  Per review of the leases provided, many of the
lease terms called for tenants to be billed for a pro-rata share of property taxes and/or
insurance.  However, it is not possible to determine what was billed or received and
if the billing was correct from the records provided.

COLL. TRIAL EX. 21 at 11-13.

The financial records kept by the Defendant and turned over to the Plaintiff in June 2010

were seriously deficient.  When questioned at trial about the small amount of documentation turned

over, the Defendant testified that he did not turn over the general ledgers he kept for the Shopping

Center, that he did not keep copies of written estimates for repairs – small or large – because they

were not required by the Plaintiff's lender, and that he did not keep the receipts for supplies spent

at Walmart, K-Mart, Home Depot, Lowe's, Sam's Club, and other retailers.  The Defendant did not,

however, keep receipts for any purchases made by Mr. Elliott but simply attributed the costs to a

category termed "supplies."  At trial, the Defendant explained his procedure for purchasing supplies

from Home Depot, Lowe's, Sam's Club, and other vendors as follows:

Q.  Okay.  You didn't keep any receipts for any of these checks related to these
entities, correct?

A.  No.  Mr. Elliott would, would go and purchase the necessary supplies, whatever
is needed, and he would bring in a tape.  I mean, you get a little, a tape of all different

94

numbers add up to what he paid.  I would agree that tape to what he paid me – . . .
and as our support is the cancelled check.

Q.  Okay.  My question was, did you keep the receipts?

A.  No, I did not.

Q.  Okay.  So if Ms. Power is looking at checks and sees a check for Home Depot for
"X" number of dollars, or to Lowe's for "X" number of dollars, there's no way she
can determine what was purchased with that check based on your not keeping the
receipts, would you agree?

A.  I agree.

Q.  And with respect to checks or purchases made at these various sellers, WalMart,
Home Depot, Lowe's, Sam's Club, your procedure was to hand Mr. Elliott, usually,
or some other person, a blank check on the Briarcliff Management II account,
correct?

A.  It was always Mr. Elliott.

Q.  Okay.  But Mr. Elliott would be given a blank check and would be asked to go
out and make purchases?

A.  Yes.

TR. at 353-354.

The Defendant also testified that he did not send invoices of repairs to the Plaintiff or consult

with Ms. Power about repairs and reimbursement requests outside of capital and/or tenant

improvements.  The record reflects, however, that the Defendant not only failed to keep receipts

from these retailers, but that he also did not keep invoices and receipts for most of the expenditures

reflected in the check stubs turned over to the Plaintiff in June 2010.  While it may be understandable

not to keep every receipt – although not a bad business practice – it is unreasonable that the

Defendant did not maintain invoices and receipts for large purchases.  It is also unreasonable that

the purposes for the expenditures are not easily ascertainable by anyone with any sort of sophistication who is reviewing the records maintained by the Defendant. This determination notwithstanding, the court also finds that there is no quantifiable injury suffered by the Plaintiff as a result of the Defendant's insufficient record-keeping.

Finally, the Plaintiff argues that the Defendant breached his fiduciary duty by not disclosing information to the Plaintiff, including that the mortgage obligation was in default. As previously discussed with respect to the analysis concerning fraudulent concealment, the parties' relationship was defined by the Management Agreement, which did not require the Defendant to notify the Plaintiff if or when cash flow for the Shopping Center increased or decreased. Ms. Power testified that she left management of the Shopping Center entirely in the Defendant's hands and did not concern herself with its operations. The record also reflects that the Defendant approached Ms. Power on at least one occasion about trying to reduce the escrow demands made by Bridger Commercial Funding. The Defendant also provided Ms. Power with financial statements prepared annually by the Defendant reflecting, among other things, that the Shopping Center was experiencing minimal or negative cash provided by operations and increasing loans payable balances. *See* COLL. TRIAL EX. 11. Ms. Power did not discuss the Shopping Center's financial condition with the Defendant and did not question the financial statements the Defendant provided her. Based upon the record, the court does not agree that the Defendant's failure to specifically discuss cash flow obligations with the Plaintiff was a breach of fiduciary duty.

Because the court finds that the Defendant breached his fiduciary duty to the Plaintiff when he paid himself management fees in excess of what he was owed under the Management Agreement,

commingled funds belonging to the Shopping Center with his own without authorization, reimbursed himself for expenses in excess of what was reasonable, and failed to maintain proper financial records, the oral motion to dismiss with respect to this cause of action will be denied.

### vi. Conversion

In support of this cause of action, the Plaintiff has argued that two of the same actions for which the Defendant breached his fiduciary duty – paying himself management fees in excess of what he was owed and improperly reimbursing himself for expenses that were unreasonably excessive – constituted conversion. Under Tennessee law, conversion "is the appropriation of tangible property to a party's own use and benefit in exclusion or defiance of the owner's rights." *PNC Mulitfamily Capital Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d at 553; *see also Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (defining conversion as an intentional tort requiring proof that a party appropriated another's property for his own use by exercising dominion and control in exclusion or defiance of the owner's right to use and benefit from the property). To establish conversion, a plaintiff must prove "(1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." *PNC Mulitfamily Capital Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d at 553. "The main focus of the tort is the interference with an owner's property right[ and t]he degree of this interference, as well as the impact on the property, determines whether there has been a conversion." *Gen. Elec. Credit Corp. of TN v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 753 (Tenn. Ct. App. 1988).

Although there is authority to the contrary, the general rule is that money is an intangible and therefore not subject to a claim for conversion. However, there is an exception where the money is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose. Identifiable funds are deemed a chattel for purposes of conversion, and conversion may be established where a party shows ownership or the right to possess specific, identifiable money. Trover will lie whenever the plaintiff's money has come into the defendant's possession and has been converted without the plaintiff's express or implied assent that the relation of debtor and creditor should arise. For money to be a subject of conversion, it need not be specifically earmarked. . . . . Conversion of checks is actionable because checks designate specific amounts of money for use for specific purposes.

*PNC Mulitfamily Capital Inst. Fund XXVI Ltd. P'ship,* 387 S.W.3d at 553 (quoting 90 C.J.S. *Trover and Conversion* § 16 (2012)).

The court, having already found that the Defendant paid himself management fees and reimbursements for loans payable to which he was not entitled in the amount of $71,536.75,[24] also finds that the Defendant converted these funds, which belonged to the Plaintiff, for his own use or benefit. Accordingly, the Defendant's oral motion to dismiss with respect to conversion shall be denied.

## III
## A. BREACH OF CONTRACT

The remaining issue, which was not included within the Defendant's oral motion to dismiss, is whether the Defendant breached the Management Agreement and, if so, to what damages, if any, the Plaintiff is entitled. "The essential elements of any breach of contract claim include (1) the

---

[24] This amount includes the $3,145.64 resulting from the Defendant's overpayment of management fees, $48,391.11 the Defendant paid himself and/or his companies from the Operating Account that cannot be accounted for, and the $20,000.00 unaccounted for broker commission deposit.

existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and

(3) damages caused by the breach of the contract." *ARC Lifemed, Inc. v. AMC-Tennessee, Inc.*,

183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (citation omitted).  Under Tennessee law, "[t]he cardinal

rule of contract interpretation is to ascertain and give effect to the intention of the parties." *White*

*v. Empire Express, Inc.*, 2012 WL 4497820, at *15, 2012 Tenn. App. LEXIS 677, at *42 (Tenn. Ct.

App. Sept. 27, 2012).

> While a contract may be either expressed or implied, or written or oral, it must result
> from a meeting of the minds of the parties in mutual assent to the terms, must be
> based upon a sufficient consideration, free from fraud or undue influence, not against
> public policy and sufficiently definite to be enforced.

*Johnson v. Central Nat'l Ins. Co. of Omaha*, 356 S.W.2d 277, 281 (Tenn. 1962); *see also*

*Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 635 (Tenn. Ct. App. 2002).

> When resolving disputes concerning contract interpretation, [the court's] task is to
> ascertain the intention of the parties based upon the usual, natural, and ordinary
> meaning of the contractual language.  All provisions in the contract should be
> construed in harmony with each other, if possible, to promote consistency and to
> avoid repugnancy between the various provisions of a single contract.

*Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1995) (citations omitted). While intent is generally

expressed in the body of the contract, "the object to be attained in construing a contract is to

ascertain the meaning and intent of the parties as expressed in the language used and to give effect

to such intent if it does not conflict with any rule of law, good morals, or public policy." *Planters*

*Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (citation

omitted).  However, if a provision may be susceptible to more than one reasonable interpretation,

it may render the terms of the contract ambiguous. *Planters Gin Co.*, 78 S.W.3d at 890.  "Where

the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal

99

interpretation of the language, and the courts must resort to other rules of construction." *Planters*

*Gin Co.*, 78 S.W.3d at 890.

In support of its claim for breach of contract, the Plaintiff argues primarily that the Defendant

breached section 4.1 of the Management Agreement, which authorized the Defendant to pay himself.

Specifically, section 4.1 provides that "[f]rom the Operating (and/or) Reserve Account(s), Agent is

hereby authorized to pay or reimburse itself for all expenses and costs of operating the Premises and

for all other sums due Agent under this Agreement, including Agent's compensation under

section 16."  TRIAL EX. 5 at ¶ 4.1.  Section 16 provided that the management fee to which the

Defendant was entitled was to be "2% of the total monthly gross receipts from the Premises, payable

by the 5th day of the month . . . [with the percentage] based upon the total gross receipts from the

Premises during the preceding month."  TRIAL EX. 5 at ¶ 16.  As has already been discussed, the

record established that the Defendant paid himself management fees of $3,145.64 and $48,391.11

for reimbursements for expenses in excess of what he was entitled to receive and that he requested

and received reimbursements for broker commissions in the amount of $20,000.00 that were not

deposited into the Operating Account.  Accordingly, these overpayments to himself constitute a

breach of the Management Agreement by the Defendant.

The court also finds that the Defendant breached section 2.1 of the Management Agreement

under which the Defendant was required to "establish a separate account(s) known as the

7212 Kingston Pike Operating (and/or) Reserve Account(s), separate and apart from Agent's

corporate accounts, for the deposit of receipts collected[.]" TRIAL EX. 5 at ¶ 2.1.  Although the

Defendant did open the Operating Account, he did so in the name of Briarcliff Management II, a

derivation on his own trade name, for which he had access and signature authority.[25]   With respect

to bank accounts, Ms. Power testified that while she understood that there was an operating account

with First Tennessee Bank, she was not a signatory on the account, she did not receive the bank

statements for the Operating Account, and she did not know whether other bank accounts associated

with the Plaintiff, including a separate tenant deposit account, had ever been established, although

the Plaintiff did not introduce any proof that a separate security deposit account was required.

The Plaintiff also contends that the Defendant's lack of more adequate financial records was

a breach of the Management Agreement; however, the Management Agreement simply required the

Defendant to provide the Plaintiff with "a statement of cash receipts and disbursements . . . [and]

such other reports as the Profit & Loss Statement, and the Balance Sheet" and the Plaintiff had "the

right to request periodic audits of all applicable accounts managed by [the Defendant.]" TRIAL EX. 5

at ¶ 6.  Both Ms. Power and the Defendant testified that the Defendant provided quarterly financial

statements at first, then only provided them annually at Ms. Power's acquiescence.  She did not

require the Defendant to produce financial statements more often, did not request any sort of audit

of the Operating Account, and did not ask for copies of invoices and/or estimates.  The Management

Agreement did not require the Defendant to maintain better financial records.  Likewise, the court

finds that the Defendant has not breached any other provisions of the Management Agreement.

---

[25] At trial, the Defendant testified that Dawn Mackey, one of his employees through Diversified Insurance,
would sign checks when he was not available.  Through his deposition testimony, the Defendant established that
Ms. Mackey was an actual signatory on the account and that he, and not Ms. Power, had authorized Ms. Mackey to sign
checks out of the Operating Account.  *See* TRIAL EX. 20 at 85, lines 7-12, 19-23.

## B.  CONTRACT DAMAGES

For his alleged breach of the Management Agreement, the Plaintiff seeks damages from the Defendant, the purpose of which "is to place the plaintiff as nearly as possible in the same position [it] would have been in had the contract been performed, but the nonbreaching party is not to be put in any better position by recovery of damages for the breach of the contract than [it] would have been if the contract had been fully performed."  *Cantrell v. Knox County Bd. of Educ.*, 53 S.W.3d 659, 662 (Tenn. 2001) (quoting *Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993)); *see also BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001) ("Generally speaking, damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties.") (quoting *Simmons v. O'Charley's, Inc.*, 914 S.W.2d 895, 903 (Tenn. Ct. App. 1995)).  This "expectation interest" is "measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform."  *BVT Lebanon Shopping Ctr.*, 48 S.W.3d at 136 (citing RESTATEMENT (SECOND) OF CONTRACTS § 347 (1979)).

It is well settled that "[t]he party seeking damages bears the burden of proving them[,]" and "[d]amages may never be based on mere conjecture or speculation.  . . .  Evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty."  *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999); *see also Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 336 (Tenn. Ct. App. 1987).

Having determined that the Defendant breached sections 2.1, 4.1, and 16 of the Management

Agreement by not opening the Operating Account in the name of 7212 Kingston Pike Operating

(and/or) Reserve Account and by paying himself $3,145.64 in management fees, reimbursing himself

and/or his companies for expenses in excess of what he was entitled to receive in the amount of

$48,391.11, and requesting and receiving but then not depositing into the Operating Account broker

commissions in the amount of $20,000.00, respectively, the court finds that the Plaintiff is entitled

to recover actual contract damages in the amount of $71,536.75.

## C.  ATTORNEYS' FEES

The Plaintiff also seeks, as contract damages, reimbursement of its attorneys' fees not only

for the prosecution of this adversary proceeding but also those fees incurred during the Plaintiff's

negotiations with LNR Partners, Inc. and Wells Fargo Bank, N.A. to restructure its mortgage

obligation.

> Tennessee, like most jurisdictions, adheres to the 'American rule' for award of
> attorney fees. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn.
> 1998); *Pullman Standard, Inc. v. Abex Corp*., 693 S.W.2d 336, 338 (Tenn. 1985).
> Under the American rule, a party in a civil action may recover attorney fees only if:
> (1) a contractual or statutory provision creates a right to recover attorney fees; or
> (2) some other recognized exception to the American rule applies, allowing for
> recovery of such fees in a particular case. *Taylor v. Fezell*, 158 S.W.3d 352, 359
> (Tenn. 2005); *John Kohl*, 977 S.W.2d at 534.  Tennessee's adherence to the
> American rule is based on several public policy considerations.

> > First, since litigation is inherently uncertain, a party should not be penalized
> > for merely bringing or defending a lawsuit.  Second, the poor might be
> > unjustly discouraged from instituting actions to vindicate their rights if the
> > penalty for losing included paying the fees of their opponent's lawyer.  Third,
> > requiring each party to be responsible for their own legal fees promotes
> > settlement.  Fourth, the time, expense, and difficulty inherent in litigating the
> > appropriate amount of attorney's fees to award would add another layer to the

litigation and burden the courts and the parties with ancillary proceedings.
Thus, as a general principle, the American rule reflects the idea that public
policy is best served by litigants bearing their own legal fees regardless of the
outcome of the case.

*House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008) (citations
omitted).

In the context of contract interpretation, Tennessee allows an exception to the
American rule only when a contract *specifically* or *expressly* provides for the
recovery of attorney fees. *Id.* ("The American rule provides that a party in a civil
action may not recover attorney's fees absent a *specific* contractual or statutory
provision providing for attorney's fees . . . .") (emphasis added); *Pullman Standard*,
693 S.W.2d at 338 ("We continue to adhere to the rule in Tennessee that attorneys'
fees are not recoverable in the absence of a statute or contract *specifically* providing
for such recovery . . . .") (emphasis added); *Pinney v. Tarpley*, 686 S.W.2d 574, 581
(Tenn. Ct. App. 1984) ("In the absence of an *express* agreement to pay attorney's fees
for enforcement of a contract, such are not recoverable in Tennessee.") (emphasis
added). If a contract does not specifically or expressly provide for attorney fees, the
recovery of fees is not authorized. *See, e.g., Kultra, Inc. v. S. Leasing Corp.*,
923 S.W.2d 536, 540 (Tenn. 1996) (holding that the term "any loss" does not include
an award for attorney fees).

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308-09 (Tenn. 2009) (footnote

omitted).

Here, there is no statutory basis for payment of attorneys' fees, nor does the Management

Agreement provide that attorneys' fees will be paid in the event of a dispute. To the contrary, the

Management Agreement states only the following concerning any breach or termination by the

Defendant:

*20.2  TERMINATION FOR CAUSE*

Notwithstanding the foregoing, this Agreement shall terminate in any event, and all
obligations of the parties hereunder shall cease (except as to liabilities or obligations
which have accrued or arisen prior to such termination, or which accrue pursuant to
paragraph 21.3 as a result of such termination, and obligations to insure and
indemnify), upon the occurrence of any of the following events[:]

(a)  BREACH OF AGREEMENT – Thirty (30) days after the receipt of notice by either party to the other specifying in detail a material breach of this Agreement, if such breach has not been cured within said thirty (30) day period; or if such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach have not commenced or/and such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured. HOWEVER, the breach of any obligation of either party hereunder to pay any monies to the other party under the terms of this Agreement shall be deemed to be curable within thirty (30) days.

. . . .

(c)  EXCESSIVE DAMAGE – Upon the destruction of or substantial damage to the Premises by any cause, or the taking of all or a substantial portion of the Premises by eminent domain, in either case making it impossible or impracticable to continue operation of the Premises.

. . . .

*20.3  TERMINATION COMPENSATION*

If (i) Owner terminates this Agreement before the end of the initial term of [sic] any subsequent term year as provided in paragraph 21.1 [sic] above for any reason other than for a breach by Agent under paragraph 21.2(a) [sic] above, . . . then in any such event, Owner shall be obligated to pay Agent as liquidated damages an amount equal to the management fee earned by Agent, as determined under paragraph 17.1 above, for the calendar month immediately preceding the month in which the notice of termination is given to Agent . . . multiplied by the number of months and/or portions thereof remaining from the termination date until the end of the initial term or term year in which the termination . . . occurred.

TRIAL EX. 5 at 9-10.  Because there is no contractual or statutory basis for the payment of attorneys' fees, the court finds that the Plaintiff is not entitled to payment of its attorneys' fees by the Defendant.

Additionally, the court finds that the Plaintiff is not entitled to reimbursement of its attorneys' fees paid to Joshua Bishop during it negotiations to restructure its mortgage obligation.  Although

the Plaintiff argues otherwise, the court does not find that the Plaintiff incurred those attorneys' fees

as a direct result of the Defendant's breach of contract.  The record evidences that Ms. Power was

provided with financial statements by the Defendant which reflected the Shopping Center's financial

condition.  Ms. Power never questioned the Defendant about the financial statements, nor did she

ever request an audit from the Defendant; however, beginning with the Balance Sheet for

December 31, 2001, these financial statements reflected net income in the following amounts:

| year | net income |
|------|------------|
| 2001 | ($ 21,996.99) |
| 2002 | ($ 26,397.43) |
| 2003 | ($  3,477.26) |
| 2004 | ($ 14,092.75) |
| 2005 | ($ 48,947.90) |
| 2006 | ($ 87,391.41) |
| 2007 | ($ 56,502.30) |
| 2008 | ($ 41,496,06) |
| 2009 | $  8,560.88 |
| 2010 | $  4,590.08 |

COLL. TRIAL EX. 11.  The primary contributor to the Plaintiff's negative cash flow was the

$25,647.16 monthly mortgage obligation and not any action or inaction taken by the Defendant.

Notwithstanding the Defendant's breach of contract with respect to his overpayments, the Plaintiff

was suffering cash flow issues from the first year, and Ms. Power should have been aware of these

issues. That she was caught unaware when the Defendant could no longer fund the mortgage

payments or that she did not attempt to renegotiate the mortgage obligation sooner do not directly

stem from any breach of the Management Agreement by the Defendant.  Accordingly, the Plaintiff

is not entitled to attorneys' fees paid to Joshua Bishop for his attempted renegotiation of the

mortgage obligation in 2009.

106

## D.  PUNITIVE DAMAGES

Finally, in addition to compensatory damages, the Plaintiff also requests punitive damages against the Defendant.  "Compensatory and punitive damage awards serve vastly different purposes. Compensatory damages are intended to compensate an injured plaintiff for personal injury or property damage and thereby make the plaintiff whole again.  In contrast, punitive damages are intended to 'punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him.'"  *Goff v. Elmo Greer & Sons Constr. Co., Inc*., 297 S.W.3d 175, 187 (Tenn. 2009) (quoting *Huckeby v. Spangler*, 563 S.W.2d 555, 558-59 (Tenn. 1978)); *see also Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906-07 (Tenn. 1999) ("The purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter others from committing similar wrongs in the future.").   Under Tennessee law, punitive damages may be assessed only in cases where "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly."  *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992); *see also Goff*, 297 S.W.3d at 187.

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result.  A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation.  A person acts maliciously when the person is motivated by ill will, hatred, or personal spite.  A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Hodges*, 833 S.W.2d at 901 (citations omitted).  Because punitive damages are warranted in only the most egregious of cases and are accessed "[t]o accomplish the twin purposes of punishment and

deterrence," a defendant's intentional, fraudulent, malicious, or reckless conduct must be proved by clear and convincing evidence. *Metcalfe v. Waters*, 970 S.W.2d 448, 451 (Tenn. 1998); *Hodges*, 833 S.W.2d at 901. "Generally, punitive damages cannot be awarded based solely on a breach of contract." *White*, 2012 WL 4497820, at *25 n.20, 2012 Tenn. App. LEXIS 677, at *72 n.20.

Based upon the record, the court does not find that the Defendant acted with the requisite intent, fraud, malice, or reckless conduct to award the Plaintiff punitive damages. The court does not find that his breach of fiduciary duty rises to the level of fraud, malice, or reckless conduct to justify an award of punitive damages. Likewise, the court will not award punitive damages based upon the Defendant's breach of the Management Agreement.

## IV

In summary, the court will grant in part and deny in part the Plaintiff's Motion to Exclude. As it relates to Trial Exhibit 27, the court will not consider any of the information found in the unnamed sixth column of that exhibit. As it relates to Late-Filed Exhibit 44, the court will consider the first five columns of information as well as the handwritten notations marked as circled numbers 1 through 8; however, the court will not consider any of the handwritten notations marked as circled numbers 9 through 26. Finally, as it relates to Trial Exhibit 29, because that exhibit was not introduced into the record during trial, the court will deny the Plaintiff's motion as moot. The court will also deny the Defendant's Motion to Strike, finding that the Defendant is not prejudiced by the inclusion and consideration of Mr. Costello's testimony and Trial Exhibits 31 and 35 concerning the Plaintiff's damages sought in the form of overpayments. Additionally, because the

Plaintiff has not satisfied the elements and/or has not met its burden of proof, the court will grant the Defendant's oral motion to dismiss with respect to the Plaintiff's claims grounded on fraudulent concealment, professional negligence, 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b)(1), attorney fees, and punitive damages.  The Complaint will be dismissed as to these claims.

With respect to the Plaintiff's remaining claims, the court finds that between March 10 and June 8, 2010, the Defendant made preferential transfers to himself and/or one of his companies from the Plaintiff's funds totaling $83,752.07 which the Plaintiff is entitled to avoid and recover under 11 U.S.C. §§ 547(b) and 550(a)(1), respectively.  Although the court has determined that the Defendant received constructively fraudulent transfers avoidable under 11 U.S.C. § 548(a)(1)(B), the court has found that these transfers are offset by the Plaintiff's recovery under 11 U.S.C. § 547(b).

The court also finds that the Defendant breached his fiduciary duty to the Plaintiff by paying himself management fees of $3,145.64 more than he was entitled to receive, by paying $48,391.11 to himself and/or one of his companies in excess of loans payable or reimbursement of expenses to which he was entitled to receive, and that he requested and received but did not deposit a $20,000.00 broker commission from the Plaintiff's tenant improvement account.  Therefore, the Defendant's oral motion to dismiss will be denied with respect to the Plaintiff's cause of action for breach of fiduciary duty.  Finally, the court finds that the actions taken by the Defendant which breached his fiduciary duty were likewise a breach of the parties' Management Agreement, thereby entitling the Plaintiff to a single award of contract damages in the amount of $71,536.75.

In total, the Plaintiff is entitled to receive and the Defendant is required to pay to the Plaintiff the sum of $155,288.82, consisting of the avoided preferential transfers in the amount of $83,752.07, plus compensatory contract damages in the amount of $71,536.75.

A Judgment consistent with this Memorandum will be entered.

FILED:  April 3, 2013

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

110